UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

*Electronically Filed*

| | | |
|---|---|---|
| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | : : : : : | |
| Plaintiff, | : : | |
| v. | : : : | CASE NO. 2:20-cv-00027-WOB-CJS |
| ROLLING STONE, LLC and PENSKE MEDIA CORPORATION, | : : : | **ORAL ARGUMENT REQUESTED** |
| Defendants. | : | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ............................................................................................ 1

II.    STATEMENT OF FACTS ............................................................................. 3

III.   LAW AND ARGUMENT ............................................................................. 7

      A.    Legal Standards .................................................................................. 7

            1.     Standard of Review ................................................................ 7

            2.     Elements of Defamation in Kentucky. .................................. 8

      B.    The Challenged Statements Are Not Defamatory as a Matter of Law. ................. 9

      C.    The Challenged Statements Are Constitutionally Protected Opinion. .................. 15

      D.    Plaintiff's Claim Is Time-Barred. ..................................................... 20

IV.   CONCLUSION ............................................................................................ 24

## I.   <u>INTRODUCTION</u>

No matter how many defamation lawsuits Plaintiff Nicholas Sandmann ("Sandmann") files against the media, each of his cases is unique. In this case, perhaps more than ever, context matters. Sandmann has cut and pasted allegations from his other defamation lawsuits into a Complaint against Defendants Rolling Stone, LLC and Penske Media Corporation (collectively, "Rolling Stone"), as if Rolling Stone and all other media outlets published the same article about Sandmann's encounter with Native American activist Nathan Phillips at the National Mall. But the Rolling Stone article was not identical to the others published, and Sandmann's cookie-cutter approach to litigation belies the First Amendment and Kentucky defamation law. To survive a motion to dismiss, Sandmann must allege a plausible defamation claim based upon the specific words and the unique context of the *Rolling Stone* article. Sandmann fails to meet this obligation and his case should be dismissed as a matter of law.

Despite over 250 paragraphs of largely extraneous allegations, Sandmann's Complaint boils down to a single statement in a single Rolling Stone article published on January 22, 2019 (the "Rolling Stone Article").[1] Specifically, Sandmann claims he was defamed when Rolling Stone republished a statement by Nathan Phillips that Sandmann "blocked my way and wouldn't allow me to retreat" (the "Blocked Retreat Statement"). While this Court has analyzed the Blocked Retreat Statement in other cases, it has not analyzed that statement in the context of the Rolling Stone Article. For purposes of this motion, that is precisely the analysis that Kentucky law requires.

Sandmann's defamation claim is rooted in the false narrative that the Rolling Stone Article implicated Sandmann in hate crimes and "inexcusably relied upon a false, incomplete and out-of-context viral video." But the Rolling Stone Article does not state that Sandmann engaged in any

---

[1]      The Rolling Stone Article was attached to Sandmann's Complaint as Exhibit G (doc. 1-7) and is attached hereto for the Court's convenience as **Exhibit 1**.

hate crimes and specifically reported that the media was "walking back previous headlines" based upon the emergence of "[a]dditional videos" that provided more context to Sandmann's encounter with Phillips. In fact, the gist of the Rolling Stone Article was not about Sandmann or his reputation, but the diverging opinions that erupted after the additional video emerged. The article extensively covered Sandmann's side of the story, including tweets from President Trump characterizing prior media coverage of the encounter as "Fake News"; quotes from Sandmann explaining he was "only attempting to 'diffuse the situation' by standing his ground"; and a link to Sandmann's full account of what transpired. In this context, Rolling Stone's republication of Phillips' statement that he felt "blocked" and unable to "retreat" cannot plausibly form the basis of a defamation claim.

Further, Sandmann's lawsuit was filed more than one year after publication of the Rolling Stone Article, so it is untimely under Kentucky's statute of limitations.  Although Sandmann was a minor at the time the Rolling Stone Article was published, he has readily proven himself capable of finding the courthouse to pursue other, timely claims arising from media coverage of the incident. Thus, Kentucky law does not toll the statute of limitations for him.

The Complaint against Rolling Stone fails for at least three separate reasons. *First*, the Rolling Stone Article, taken as a whole, presented Phillip's Blocked Retreat Statement in a unique context that is non-defamatory as a matter of law. *Second*, the challenged statements are pure opinion under Kentucky law because they fully disclosed the facts upon which they were based, including a photograph of Sandmann and Phillips face to face in close proximity to each other, plus additional video footage that had emerged and Sandmann's full statement about the encounter. *Third*, Sandmann's claims are time-barred because this lawsuit was not filed within one year of the date Rolling Stone published its article.

II.   <u>**STATEMENT OF FACTS**</u>

The Court is well-acquainted with the facts surrounding the encounter on the steps of the Lincoln Memorial on January 18, 2019. After participating in an unrelated public march, Sandmann and his classmates assembled on the steps of the Memorial, where he encountered Native American activist Nathan Phillips. (Doc. 1, ¶¶ 33-34, 38-40.) Sandmann was wearing a hat bearing a slogan, "Make America Great Again," that is commonly associated with President Trump. (*Id.* at ¶ 35.) During the meeting, Sandmann stood still and smiled while Phillips played a drum and sang. (*Id.* at ¶¶ 39, 54, 71.) Both stood in place, staring at each other, until Sandmann and his classmates were summoned by chaperones to leave. (*Id.* at ¶¶ 54, 60-61.) Also during the encounter, Sandmann's classmates circled the pair and engaged in various antics—dancing and chanting—while Sandmann and Phillips continued their face-off.  (*Id.* at ¶¶ 37, 41.)

Unlike similar lawsuits that have come before the Court, the sole basis of Sandmann's claim here is a single article about his encounter with Phillips published on Rolling Stone's website, www.RollingStone.com, on January 22, 2019.  (*Id.* at ¶¶ 199, 202-209; doc. 1-7.)  The Rolling Stone Article's title is "Trump Comes to the Rescue of the MAGA Teens," and its subtitle is "Right-wing media is using confusion over what exactly happened to paint the Covington Catholic teenagers as victims."  (Doc. 1-7 at PAGEID# 85.) The article led with a photograph of President Trump in a "Make American Great Again" hat.  (*Id.*)

The opening paragraph of the Rolling Stone Article indicated it was covering the recorded "confrontation" between "a rowdy group of students" and "a Native-American protester named Nathan Phillips." (Doc. 1-7 at PAGEID# 85.) From the start, the article noted that Phillips was shown being "taunted by the teens" in one video clip of the January 18 incident, but that—before the Rolling Stone Article—"Sandmann released a statement alleging otherwise while directing people to other clips of the incident." (*Id.*)

3

The article went on to note that "[d]ebate around the confrontation raged throughout the weekend" (after January 18) and that, soon after, "President Trump came to the defense of the teens." (*Id.*) Rather than Sandmann or Phillips, the prominent feature of the first one-third of the Rolling Stone Article is President Trump's view of the situation, as expressed in several of his tweets embedded in the article. (*Id.* at PAGEID# 85-86.) In the embedded tweets, the President stated that Sandmann had been "treated unfairly with early judgements proving out to be false," quoted Tucker Carlson for the assertion that "'[n]ew footage shows that media was wrong about teen's encounter with Native American,'" called Sandmann and his classmates "symbols of Fake News and how evil it can be," and opined that the situation "started off unpleasant, but can end in a dream!" (*Id.* at PAGEID# 86.)

The article then covered Sandmann's publicly released statement on the controversy published by CNN on January 20. In addition, the article included clickable text with a hyperlink to the full text of that statement.[2] In the statement, Sandmann indicated that he was providing a "factual account of what happened on Friday afternoon at the Lincoln Memorial to correct misinformation" being disseminated about him. (Doc. 1-7 at PAGEID# 86; *see also* doc. 1-3 at PAGEID# 72.) In addition to linking the entire statement, the Rolling Stone Article quoted various portions of Sandmann's public statement and his view of the events in question:

> Sandmann claims the students responded with 'school spirit chants,' after which Phillips and other Native-American protesters approached the group, with Phillips 'wading' into the crowd with his drum. Sandmann writes that Phillips locked eyes with him, approached him and began playing his drum 'within inches of my face.' Sandmann says that he was 'startled and confused' and only attempting to 'diffuse

---

[2]     The full text of the Sandmann's statement that was hyperlinked in the Rolling Stone Article and attached to Sandmann's Complaint as Exhibit C (doc. 1-3) is attached hereto as **Exhibit 2**. Sandmann's assertion in his Complaint that after "the January 18 Incident and prior to Rolling Stone's January 22 Article, Nicholas had issued no public statements" (doc. 1, ¶ 216) is belied by his own pleading: "On the afternoon of January 20, 2019, . . . Nicholas made public a statement in which he provided a detailed and accurate factual description of the January 18 Incident." (*Id.* at ¶ 89; *see also* doc. 1-3.)  Sandmann likely cut and pasted the former (incorrect) assertion from another lawsuit.

the situation' by standing his ground and smiling at Phillips.  He continued to detail a belief that he and his classmates were victims.

(Doc. 1-7 at PAGEID# 86; *see also* doc. 1-3 at PAGEID# 72.) The Rolling Stone Article closed its coverage of Sandmann's statement by noting that "[a]dditional videos confirm Sandmann's claim that African-American protesters yelled a series of vile invectives at the students. They had also been harassing the Native-American protesters." (Doc. 1-7 at PAGEID# 86.)

In his statement, Sandmann also wrote that he "never felt like [he] was blocking the Native American protestor" and that he respected Phillips' "right to protest and engage in free speech activities." (Doc. 1-3 at PAGEID# 73.) Sandmann further stated: "I can only speak for myself and what I observed and felt at the time. But I would caution everyone passing judgement based on a few seconds of video to watch the longer video clips that are on the internet, as they show a much different story than is being portrayed by people with agendas." (*Id.* at PAGEID# 74.)

The Rolling Stone Article then presented Phillips' account of the January 18 incident, noting that "Phillips has admitted that he attempted to intervene between the students and the African-American protesters, but has disputed Sandmann's account, as have other videos of the incident showing Covington students circled around Phillips, who said he felt threatened."  (Doc. 1-7 at PAGEIDE# 86.) The Rolling Stone Article then quoted directly Phillips' statement to the *Washington Post*: "'It was getting ugly,' Phillips, a former Marine, told the *Washington Post*," and embedded a hyperlink to the *Post*'s article containing the quote from Phillips. (*Id.*)  The Rolling Stone Article continued to quote Phillips' Blocked Retreat Statement from the *Post*: "'I was thinking: I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial. I started going that way, and that guy in the hat stood in my way, and we were at an impasse. He just blocked my way and wouldn't allow me to retreat.'" (*Id.*)

5

The article closed by observing the "confusion around what exactly happened" and opining that "[r]ight-wing media has used the additional footage to paint the students as victims of a Fake News conspiracy to mischaracterize the confrontation." (Doc. 1-7 at PAGEID# 86.) It concluded, "Sandmann will continue to tell his side of the story when he sits down with Savannah Guthrie of the Today show Wednesday morning." (*Id.* at PAGEID# 87.)

Sandmann claims that the Blocked Retreat Statement is "unequivocally and provably false" because Sandmann did not block Phillips from retreating during their encounter.  (Doc. 1, ¶ 203.) Sandmann also alleges the statement "conveys a defamatory meaning because it imputes to Nicholas racist conduct" towards Phillips, namely (1) "aggression constituting an intent-to-intimidate assault," (2) "menacing racial intimidation," and (3) "a hate crime for interfering with a Native American prayer and song ceremony."  (*Id.* at ¶ 204.) Finally, Sandmann alleges that the Rolling Stone Article "falsely accuse[d]" him "of 'aggressively mocking' Phillips and the other Native Americans" with the statement: "The confusion around what exactly happened seems to have obscured the video footage that does indeed show a bunch of teens in #MAGA gear aggressively mocking a Native American." (*Id.* at ¶ 206; doc. 1-7 at PAGID# 86, the "Aggressively Mocking Statement".)  But, unlike the Blocked Retreat Statement, the Complaint does not allege that this Aggressively Mocking Statement is defamatory.

Equally important to an analysis of Sandmann's claim is also what statements are *not* a basis for it. Sandmann does not claim that the various tweets quoted in the Rolling Stone Article or the reporter's editorial comments about Sandmann or his classmates were defamatory. And while Sandmann refers to other articles allegedly published by Rolling Stone, even pointing out other alleged falsehoods (*see, e.g.*, doc. 1, ¶ 205), he does not claim any statements in those articles were defamatory, published with fault, damaged him, or otherwise gave rise to a defamation claim (*see, e.g.*, *id.* at ¶¶ 219, 249, 255).  Rather, Sandmann's sole basis of his claim and the lawsuit

against Rolling Stone is the single use of Phillips' Blocked Retreat Statement within the Rolling Stone Article.  (*Id.* at ¶¶ 198, 202-204, 206.)

## III.   <u>LAW AND ARGUMENT</u>

In evaluating the Rolling Stone Article, context and timing are critical. Despite insinuations from Sandmann's voluminous pleading, Rolling Stone did not simply republish allegedly false and defamatory statements about Sandmann attacking Phillips in a race-based incident. Rather, several days after the stand-off, the Rolling Stone Article discussed the controversy that had arisen based upon additional footage that had emerged and the various opinions on the controversy—from Sandmann, Phillips, the President of the United States, and the author of the article. Sandmann's defamation claim against Rolling Stone should be dismissed as a matter of law because the Blocked Retreat Statements are: (1) not defamatory when view in the context of the complete Rolling Stone Article as a whole; (2) constitutionally protected opinions based upon the fully disclosed facts that are uniquely presented in the Rolling Stone Article; and (3) time-barred.

### A.   **Legal Standards**

#### 1.   <u>Standard of Review</u>

To survive a Rule 12(b)(6) motion, a complaint must plead sufficient facts to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Smith v. Tipton Cty. Bd. of Education*, 916 F.3d 548, 552 (6th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Although the court must accept as true all allegations contained in a complaint, this rule does not apply to legal conclusions. *Id.*, 556 U.S. at 678. Further, "it is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated

. . . laws in ways that have not been alleged." *Assoc. Gen. Contractors v. Cal. State Counsel of Carpenters*, 459 U.S. 519, 526 (1983).

Sandmann has incorporated the Rolling Stone Article into his pleadings by attaching it to his Complaint. *Bassett v. Natl. Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). The article also contains embedded content and hyperlinks to several other publications, including Sandmann's own public statements and President Trump's tweets. All of the linked content in the Rolling Stone Article may also be considered in deciding a Rule 12(b)(6) motion to dismiss without converting it to a Rule 56 motion for summary judgment. *See Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) ("[A] document that is not formally incorporated by reference or attached to a complaint may still be considered part of the pleadings . . . [if it] is referred to in the complaint and is central to the plaintiff's claim.") (internal citation and quotation omitted). Moreover, when an exhibit to a complaint contradicts allegations within a complaint, the exhibit trumps the allegations. *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) ("[I]f a factual assertion in the pleadings is inconsistent with a document attached for support, the Court is to accept the facts as stated in the attached document.") (internal quotations omitted).[3] In fact, when the "pleadings internally contradict verifiable facts central to [a plaintiff's] claims, that makes [the] allegations implausible." *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017).

### 2. Elements of Defamation in Kentucky.

Under Kentucky law, a plaintiff seeking to recover for defamation must plead and prove: "(a) a false and defamatory statement concerning [the plaintiff]; (b) an unprivileged publication to

---

[3] Notwithstanding Sandmann's occasional reference to them, the other articles Rolling Stone (or any other media outlet facing a lawsuit by Sandmann) published about the incident (*see, e.g.*, doc. 1, ¶¶ 28-29), are not a basis of Sandmann's claim and are not properly considered in evaluating the present motion. *See Roche v. Home Depot U.S.A.*, 197 F. App'x 395, 398 (6th Cir. 2006) ("In determining whether a writing is libelous per se, courts must stay within the 'four corners' of the written communication.") (citations and internal quotation marks omitted).

a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014) (footnote omitted) (quoting Restatement (Second) of Torts § 558 (1977)).

Language is "defamatory" if it "'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Ball v. E.W. Scripps Co.*, 801 S.W.2d 684, 688 (Ky. 1990) (quoting Restatement (Second) of Torts § 559 (1977)). Written words are defamatory per se if they "tend to injure one in his reputation or to expose him to public hatred, contempt, scorn, obloquy, or shame." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 795 (Ky. 2004), *overruled on other grounds by Toler*, 458 S.W.3d 276. "In determining whether a writing or publication is libelous per se, it must be stripped of all innuendo, colloquium, and explanatory circumstances, and, when so construed, it must be defamatory on its face, within the four corners thereof." *Sweeney & Co. v. Brown*, 60 S.W.2d 381, 384 (Ky. 1933). In all other cases, written statements are defamatory only per quod, "and special damages, i.e., actual injury to reputation,[4] must be affirmatively proved if a comprehension of the defamatory nature of the written or spoken words requires extrinsic evidence of context or circumstances." *Stringer*, 151 S.W.3d at 795. Under these principles, Sandmann's claim fails as a matter of law.

**B.  The Challenged Statements Are Not Defamatory as a Matter of Law.**

"It is an elementary principle of the law of libel that the defamatory matter complained of should be construed as a whole." *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 884 (Ky. 1981). But, as this Court has noted in a similar case, "[i]n determining whether a

---

[4]  Although Sandmann ostensibly has pled $438 of special damages in the form of medical expenses (doc. 1, ¶ 255(d)), his claim here is based solely on a theory of defamation per se (*id.* at ¶¶ 209, 254). Moreover, these *de minimis* damages are neither sufficient nor the type contemplated by Kentucky law to support a defamation claim. *See Zeran v. Diamond Broad., Inc.*, 203 F.3d 714, 718 (10th Cir. 2008) (holding *de minimis* medical expenses did not support a claim for defamation); *see also Stringer*, 151 S.W.3d at 795.

writing is libelous per se [under Kentucky law], courts must stay within the four corners of the written communication. . . . The words must be given their ordinary, natural meaning as defined by the average lay person." *Sandmann v. WP Co. LLC*, 401 F.Supp.3d 781, 790 (E.D. Ky. 2019) (quoting *Roche v. Home Depot U.S.A.*, 197 F. App'x 395, 398 (6th Cir. 2006)). "The face of the writing must be stripped of all innuendoes and explanations," *Roche*, 197 F. App'x at 398, because "innuendo . . . cannot enlarge or add to the sense or effect of the words charged to be libelous." *Dermody v. Presbyterian Church (U.S.A.)*, 530 S.W.3d 467, 475 (Ky. App. 2017); *accord Sweeney*, 60 S.W.2d at 384 (holding that, to be libelous per se, the publication "must be defamatory on its face"). Then, the court must "analyze the article in its entirety and determine if its gist or sting is defamatory." *McCall*, 623 S.W.2d at 884.

The law requiring this Court to analyze the entire context of the Rolling Stone Article is a different legal proposition than the "neutral reportage doctrine," which Kentucky has not adopted. *McCall*, 623 S.W.2d at 886-87. Rolling Stone does not claim "absolute immunity from liability for accurately reporting 'newsworthy statements,' regardless of" their belief about statements' truth. *Id.* at 886. Rather, Sandmann's Complaint should be dismissed because the Rolling Stone Article, taken as a whole, and in the context of the multiple perspectives presented, is not defamatory on its face. *Croce v. New York Times Co.*, 345 F.Supp.3d 961, 976 (S.D. Ohio 2018), *aff'd*, 930 F.3d 787 (6th Cir. 2019) (finding, while the neutral reportage doctrine did not apply, "statements published in a 'balanced report of both parties' arguments and defenses' are not, as a matter of law, defamatory in the first instance") (citation omitted).

Stripped of innuendo and external influence, the Rolling Stone Article provided a synopsis of several views of the January 18 encounter, including those of the two major participants: Sandmann, with extensive quotations from and a link to his full public statement first published by CNN, and Phillips' statements to the *Washington Post*. The article never adopted either view

10

as a complete and accurate account of events.  As to Sandmann, the article explained that he wrote "that Phillips locked eyes with him, approached him and began playing his drum 'within inches of my face,'" and that "Sandmann says that he was 'startled and confused' and [was] only attempting to 'diffuse the situation' by standing his ground and smiling at Phillips." (Doc. 1-7 at PAGEID# 86.) The Rolling Stone Article also noted Sandmann's "belief that he and his classmates were victims." (*Id.*) As to Phillips, the Rolling Stone Article stated that he "disputed Sandmann's account" and quoted his several statements to the *Washington Post*: he wanted to "find [himself] an exit," but "that guy in the hat stood in my way, and we were at an impasse. He just blocked my way and wouldn't allow me to retreat." (*Id.*) Given this context and balance—Sandmann's account directly juxtaposed with Phillips'—the Blocked Retreat Statement within the Rolling Stone Article is not capable of a defamatory meaning as a matter of law.

Although Sandmann attempts to infuse the allegedly misleading "viral video" into the Rolling Stone Article (*see, e.g.*, doc. 1, ¶¶ 14, 195, 197), the article contains no link to that video and explicitly states that additional video has emerged providing more context for the encounter. (*See generally* doc. 1-7.) In fact, the first paragraph of the article noted, "[i]n a widely circulated clip, Phillips was taunted by the teens," but that "Sandmann released a statement alleging otherwise *while directing people to other clips of the incident*." (*Id.* at PAGEID# 85.) (Emphasis added.) Further on, the article explained, "[a]dditional videos confirm Sandmann's claim" about harassment by other protesters, but that "other videos of the incident" showed "students circled around Phillips." (*Id.* at PAGEID# 86.) As the Sixth Circuit has said, when "pleadings internally contradict verifiable facts central to [a plaintiff's] claims, that makes his allegations implausible." *Bailey*, 860 F.3d at 387. And Rolling Stone's balanced discussion of the additional video further underscores why the Blocked Retreat Statement could not plausibly have a defamatory meaning

11

in this context—no reasonable person would read this coverage, in full, and inherently "hate, scorn, or shame" Sandmann because of it.

The Rolling Stone Article also provided—indeed, led with—President Trump's perspective of the incident expressed on Twitter. The President's tweets declared that Sandmann had been "treated unfairly with early judgements proving out to be false" and asserted that "'[n]ew footage shows that media was wrong about teen's encounter with Native American.'"  (Doc. 1-7 at PAGEID# 86.)  Hence, the article's "gist" or "sting" is its headline: "Trump comes to the Rescue of the MAGA teens." The article's overall assertion that the President defended Sandmann serves to further establish that the Blocked Retreat Statement as contained within the Rolling Stone article could not plausibly be defamatory as a matter of law.

Rather than address the full content of the article, Sandmann cuts and pastes from his pleadings against other media defendants, attempting to ascribe a non-existent "gist" to it. According to Sandmann, the Blocked Retreat Statement in the Rolling Stone Article somehow imputed "racist conduct" to Sandmann, including "an intent-to-intimidate assault"; "menacing racial intimidation"; and "a hate crime." (Doc. 1, ¶ 204.) Sandmann's alleged gist ought to have some relation to the actual publication. *See* Restatement (Second) of Torts § 563 (1977). But it does not. The words "race," "assault," and "crime" appear nowhere in the Rolling Stone Article, nor do their derivatives or synonyms. Sandmann's purported gist is not based in the article. Instead, it is based on quotes from other persons not associated with Rolling Stone.[5] (*See, e.g.*, doc. 1, ¶¶ 28-29 (quoting KTXL Fox40), 72 (quoting an alleged fake Twitter account) and 144-149 (quoting various media outlets, but not Rolling Stone).

---

[5]     Sandmann's reference to Rolling Stone's previous articles is irrelevant.  (*See, e.g.*, doc. 1, ¶ 205.) Sandmann's defamation claim is not based on those articles, he makes no specific allegations about their content being unlawful, and they are not properly considered in analyzing his claim of defamation per se. *See Roche*, 197 F. App'x at 398.

Sandmann's allegation that the Blocked Retreat Statement or even any part of the Rolling Stone Article accused him of racist criminal conduct is simply not plausible when taking into account the full context of the article. No part of the Rolling Stone Article stated or implied that Sandmann, or any of his classmates, committed or were charged with any type of crime. "Put simply, the article does not say that [Sandmann] is guilty of any of these allegations and charges of [] misconduct, nor does the article suggest that these allegations are true." *Croce v. New York Times Co.*, 930 F.3d 787, 794 (6th Cir. 2019). Thus, even if a reader concluded that the actions described somehow constituted an "assault," that conclusion would be nothing more than the reader's (unreasonable) subjective interpretation of the video. *See Southern Air Transport, Inc. v. Am. Broadcasting Cos., Inc.*, 877 F.2d 1010, 1016-17 (D.C. Cir. 1989); *accord Sandmann*, 401 F.Supp.3d at 790 ("'Although defamation is not a question of majority opinion, neither is it a question of the existence of some individual . . . with views sufficiently peculiar to regard as derogatory what the vast majority of persons regard as innocent.'") (quoting Restatement (Second) of Torts § 559, cmt. e (1977)).

Nor did any part of the article accuse Sandmann of being a racist. All of Sandmann's allegations that Rolling Stone implicated Sandmann in racist conduct are innuendo based in material extraneous to the publication that is not actionable under Kentucky law. *Dermody*, 530 S.W.3d at 475. Sandmann's assertion that some portion of the country considers "Make America Great Again" to be racist does not change this analysis. (Doc. 1, ¶ 165.)[6] As this Court has observed, "attributing to an individual 'membership in a political party in the United States that is a mainstream party and not at odds with the fundamental social order is not defamatory.'" *Sandmann*, 401 F.Supp.3d at 795 (quoting *Cox v. Hatch*, 761 P.2d 556, 562 (Utah 1988)). Even if

---

[6]     Sandmann's allegations regarding the slogan "build the wall" are wholly irrelevant. (Doc. 1, ¶ 166.) This phrase appears nowhere in the Rolling Stone Article.

an accusation of racism could be derived from the Rolling Stone Article—which it cannot—generally, "a simple accusation of racism is not enough. Rather, the accusation must imply more, by for instance suggesting that the accused has personally broken the law to act in a racist manner." *McCafferty v. Newsweek Media Group, Ltd.*, -- F.3d --, No. 19-1545, 2020 WL 1862250, *4 (3d Cir. Apr. 14, 2020) (internal quotations, alteration, and citation omitted).  The Rolling Stone Article did none of these things.

Phillips' alleged status as a known prevaricator is also irrelevant to this analysis. (*See, e.g.*, doc. 1, ¶¶ 102-105.) Nowhere does the Rolling Stone Article declare that Phillips—or, for that matter, Sandmann or Trump—holds the correct view of the encounter. Rather, the article opines that "Sandmann's statement has been embraced as gospel" by others, but the author believed that "clear video evidence of the teens harassing Phillips has been ignored." (Doc. 1-7 at PAGEID# 86.) The Rolling Stone Article did not endorse Phillips or his Blocked Retreat Statement in any way. The article is about the *controversy* surrounding the encounter and the ensuing media coverage, not about Sandmann supposedly "blocking" Phillips. Even though Phillips' statements appear in the article, the content within its four corners makes plain that his is to be considered one perspective among several and so it is not defamatory as a matter of law.

Finally, while the republication of a defamatory statement made by a third party can be actionable, accurately reporting statements of a third party with qualifying language, in context, and without an independent assertion of their truth is not defamatory as a matter of law. *Croce*, 930 F.3d at 794 (applying Ohio law rejecting neutral reportage doctrine). The Rolling Stone Article qualifies Phillips' statements as "disput[ing] Sandmann's account" based on his "feelings" and clearly places the reader on notice that there are different perspectives regarding the Blocked Retreat Statement and that readers can reach their own conclusions based upon the additional video

14

footage. "A reasonable reader would therefore interpret the article as presenting two sides of this controversy," which means the article was not defamatory. *Croce*, 930 F.3d at 795.

Because the Rolling Stone Article presented numerous different perspectives regarding the Blocked Retreat Statement, including those of Sandmann and Phillips, it is not defamatory as a matter of law and Sandmann's claim should be dismissed.

### C.    The Challenged Statements Are Constitutionally Protected Opinion.

Under Kentucky law, a statement constituting "pure opinion" is not actionable as a matter of law. Pure opinion is absolutely privileged and "occurs where the commenter states the facts on which the opinion is based, or where both parties to the communication know or assume the exclusive facts on which the comment is clearly based." *Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989). A statement in the form of an opinion can be defamatory, but it "'is actionable only if it implies the allegation of an undisclosed defamatory fact as the basis for the opinion.'" *Id.* (quoting Restatement (Second) of Torts § 566 (1977)). As with determining whether a statement is defamatory, to determine whether a statement is a protected opinion, it "must be construed in the context of the entire communication." *Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 738 (Ky. Ct. App. 2004) (citing *Yancey*, 786 S.W.2d at 857). Kentucky state law on this point is consistent with the United States Supreme Court's later pronouncements. An opinion based on disclosed facts can create liability only "if the disclosed facts are incomplete, incorrect, or if [the] assessment . . . is erroneous." *Cromity v. Meiners*, 494 S.W.3d 499, 503 (Ky. Ct. App. 2015) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990)).

Further, as this Court previously held, "terms such as . . . taunting, disrespect, . . . [and] aggressive" are "examples of loose, figurative, rhetorical hyperbole that is protected by the First Amendment because it is not susceptible of being proved true or false." *Sandmann*, 401 F.Supp.3d at 792 (internal quotations and citation omitted). Under these principles, the Court should quickly

dispose of Sandmann's claim to the extent it is based on the Rolling Stone Article "falsely" accusing Sandmann of "aggressively mocking a Native American." (Doc. 1, ¶ 206.) Not only does Sandmann fail to even allege this statement was defamatory, but this is precisely the type of language this Court has described as pure opinion protected by the First Amendment. A characterization of "aggressively mocking" is "inherently subjective" and hyperbolic. Further, this statement is not about Sandmann, but a "bunch of teens in #MAGA gear." (Doc. 1-7 at PAGID# 86.) Even if it could be reasonably read to concern Sandmann, the basis for this opinion was fully disclosed in the Rolling Stone Article: video of a "rowdy group of students," "[a]dditional videos" of the African-American protesters, and "other videos . . . showing Covington students circled around Phillips." (*Id.* at PAGEID# 85-86.) Sandmann cannot assert a claim based on this statement in the Rolling Stone Article.[7]

The Blocked Retreat Statement is also pure opinion because the Rolling Stone Article disclosed all facts upon which it was based. As the Court has already held, Phillips' assertion that he was "blocked" is "not 'capable of being proved objectively incorrect.'" *Sandmann*, 401 F.Supp.3d at 792 (quoting *Clark v. Viacom Intern. Inc.*, 617 F. App'x. 495, 508 (6th Cir. 2015)). Although the Court later reversed in part that decision based on a request for further context for Phillips' statements, the Rolling Stone Article provided that context and fully disclosed all the additional facts that had emerged and which Sandmann argues should have been previously disclosed. *See Sandmann v. WP Co. LLC*, E.D. Ky. No. 2:19-00019, Doc. 64 at PAGEID# 861.

Despite Sandmann's bald conclusion that "Rolling Stone inexcusably relied on a false, incomplete and out-of-context viral video," (doc. 1, ¶ 14), a cursory read of the Rolling Stone

---

[7] For this same reason, the portion of the Blocked Retreat Statement where Phillips says "It was getting ugly" is purely subjective opinion that is protected as a matter of law, and for which Defendants cannot be liable. *Sandmann*, 401 F.Supp.3d at 792 ("The above terms [including 'ugly'] are also 'inherently subjective,' like 'dirtiest' . . . .") (quoting *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 598 (6th Cir. 2013)).

Article establishes this allegation is untrue. Where "'a factual assertion in the pleadings is inconsistent with a document attached for support, the Court is to accept the facts as stated in the attached document.'" *Williams*, 498 F. App'x at 536 (citation omitted). First, the Rolling Stone Article disclosed additional video that told a more complete story than an initial "widely circulated clip." (Doc. 1-7 at PAGEID# 85.) Second, the article observed that when the new video emerged, some members of the media were "walking back" their initial reporting. (*Id.*) Third, the article addressed the President's opinions and the factual predicate for them, including that "early judgments [were] proving out to be false," that "'[n]ew footage show[ed] that media was wrong about teen's encounter with Native American,'" and that initial coverage of the incident had been "Fake News." (*Id.* at PAGEID# 86.) Fourth, the article disclosed the existence of "[a]dditional videos," which "*confirm[ed] Sandmann's claim* that African-American protesters yelled a series of vile invectives at the students." (*Id.*) (Emphasis added.) The Rolling Stone Article not only covered multiple opinions about the encounter, but also disclosed the stated factual bases for those opinions. Readers were "in as good a position as the author to judge whether the conclusion [he] reached . . . was correct." *Lassiter v. Lassiter*, 456 F.Supp.2d 876, 882 (E.D. Ky. 2006), *aff'd*, 280 F. App'x. 503 (6th Cir. 2008).

The Rolling Stone Article went beyond disclosure of the additional video; it also disclosed the following facts, quoting from Sandmann's own account of the incident:

- Sandmann and his classmates "were sightseeing at the Lincoln Memorial when they were accosted by a group of black supremacist protesters." (Doc. 1-7 at PAGEID# 86.)

- The "students responded with 'school spirit chants,' after which Phillips and other Native-American protesters approached the group." (*Id.*)

- Phillips was "'wading' into the crowd with his drum." (*Id.*)

- "Phillips locked eyes with him [Sandmann], approached him and began playing his drum 'within inches of my face.'" (*Id.*)

- Sandmann "was 'startled and confused' and only attempting to 'diffuse the situation' by standing his ground and smiling at Phillips."  (*Id.*)

- Sandmann "detail[ed] a belief that he and his classmates were victims."  (*Id.*)

Moreover, the Rolling Stone Article did not ask readers to rely only on its reiteration of Sandmann's account. It provided a link directly to Sandmann's *full* public statement regarding the issue, which included additional facts about the encounter. (*Id.* at PAGEID# 86.)

Finally, the article noted that Sandmann would appear on national television the following morning "to tell his side of the story"; i.e., to continue to disclose further facts (or state opinions) about the incident. Readers of the Rolling Stone Article did not receive partially obscured defamatory assertions but instead had the factual bases for the statements quoted in the article— and knew where they could look for more. Indeed, it is difficult to conceive of what other facts Sandmann would have wanted Rolling Stone to disclose. The Rolling Stone Article discloses every single fact that Sandmann argues should have been disclosed throughout his Complaint. Sandmann may not like Phillips' subjective opinion that he was blocked and could not retreat, but the Rolling Stone Article disclosed all the facts that could have possibly formed the basis for that opinion.

Because "a pure expression of opinion is absolutely privileged," and because Rolling Stone stated "the facts on which the opinion is based," the Rolling Stone Article is pure opinion protected by Kentucky law.  *Cromity*, 494 S.W.3d at 503 (internal quotations omitted) (quoting *Yancey*, 786 S.W.2d at 857).  When the case is one of public concern, as the Court already has noted this one is, this proposition applies with additional force. *See Cromity*, 494 S.W.3d at 504 (citing *Milkovich*, 497 U.S. at 20); *see also Sandmann*, 401 F.Supp.3d at 789 (noting that the events in question were "inherently a matter of public concern"). Thus, Rolling Stone's coverage of the events with full context—disclosing each participant's view and the alleged factual predicate for them— constitutes "pure opinion."

18

The Rolling Stone Article also contains all the badges of a quintessential opinion piece. As this Court has observed, "the natural tendency" is to infer that material "posted on opinion websites" is opinion. *Loftus v. Nazari*, 21 F.Supp.3d 849, 854 (E.D. Ky. 2014). The "category tabs" in the upper-left corner of the online article indicate that its author or editors considered it to be about "politics news," a subject that inherently (and primarily) involves opinions. (Doc. 1-7 at PAGEID# 85.) The article's headline—"Trump Comes to the Rescue of the MAGA Teens"—alerts readers that it will share a point of view about the article's focus, the President of the United States. (*Id.*) The subtitle reinforces that it is an opinion piece positing that "[r]ight-wing media is using confusion over what exactly happened" to advance an alleged agenda. (*Id.*) Given all this context, the "natural tendency" of any reasonable reader would be to conclude that the article was composed of and contained constitutionally protected opinions.

The "general tenor" of the Rolling Stone Article further places the reader on notice that it is an opinion piece. *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 598 (6th Cir. 2013) (holding travel website's assertion, based on user reviews, that hotel was the "dirtiest" was protected opinion). The Rolling Stone Article did not republish Phillips' statements by themselves and present them as an undisputed factual account of what transpired. Rather, the article balanced Phillips' Blocked Retreat Statement with competing quotes from the President and Sandmann and disclosed the additional video footage that a reader could weigh to assess the diverging subjective opinions regarding the encounter. This is the type of "subjective weighing of factors [that] cannot be proven false and therefore cannot be the basis of a defamation claim." *Id.* at 600 (citing *Compuware Corp. v. Moody's Investors Services, Inc.*, 499 F.3d 520, 529 (6th Cir. 2007)).

Although this Court held, in a different case based on different publications, that it would permit discovery "regarding [Phillips'] statements *and their context*," Rolling Stone's article here provides that context, disclosing all the additional facts that had emerged. *Sandmann v. WP Co.*

19

*LLC*, E.D. Ky. No. 2:19-00019, Doc. 64 at PAGEID# 861 (emphasis added).  The Rolling Stone Article disclosed the existence of the additional video footage that caused the media to walk back its original reporting on the events and detailed the different perspectives of Sandmann, Phillips, and others regarding the encounter.  The article never adopted Phillips' alleged version of events. The article also divulged "all the underlying facts on which" any point of view—particularly Sandmann's and Phillips'—could have been based.  *Sandmann*, 401 F.Supp.3d at 792-93 (citing *Macineirghe v. County of Suffolk*, No. 13-cv-1512, 2015 WL 4459456 (E.D.N.Y. July 21, 2015)).  Because the Rolling Stone Article left no fact undisclosed, it is protected as opinion under Kentucky law.[8]

Sandmann cannot assert a claim for defamation against Rolling Stone for publishing Phillips' opinions based upon fully disclosed facts any more than Phillips can assert a claim against Rolling Stone for publishing Sandmann's opinions based upon the same fully disclosed facts. "Everyone is free to speculate about someone's motivations based on disclosed facts about that person's behavior." *McCafferty*, 2020 WL 1862250, at *4.  That is exactly what readers were permitted to do after reviewing the entirety of the Rolling Stone Article.  Accordingly, the Blocked Retreat Statement within the full context of the Rolling Stone Article is constitutionally protected pure opinion and Sandmann's defamation claim should be dismissed as a matter of law.

### D.     Plaintiff's Claim Is Time-Barred.

The Court also should dismiss the Complaint for the independent reason that Sandmann did not file it within the one-year statute of limitations for defamation claims.  KRS 413.140(1)(d).

---

[8]     Any alleged imputation of "racist conduct" by Sandmann—besides being unfounded—would be protected opinion, because simply referring to someone as racist or bigoted constitutes nonactionable opinion. *See, e.g.*, *Squitieri v. Piedmont Airlines, Inc.*, No. 3:17CV441, 2018 WL 934829, *4 (W.D.N.C. Feb. 16, 2018) (collecting cases); *Williams v. Kanemaru*, 309 P.3d 972, 130 Hawai'i 304 (Haw. Ct. App. 2013). Further, because the article quoted Phillips' assertion that he was blocked *after Sandmann's assertion that he did no such thing*, it is not only irrelevant but also impossible "that others may have attributed a derogatory meaning to this statement," particularly one related to racist conduct.  *Sandmann*, 401 F.Supp.3d at 794.

The limitations period here expired on January 22, 2020, yet Sandmann filed this action a month and a half late—on March 2, 2020.  Rolling Stone is aware that under Kentucky law, when "a person entitled to bring" a defamation action is an infant "at the time the cause of action accrued," the claim "may be brought within the same number of years after the removal of the disability or death of the person," *see* KRS 413.170(1). However, the Kentucky Court of Appeals has held that this tolling provision does not apply to plaintiffs like Sandmann who have evidenced no disability impeding their capacity to sue and for whom the statute serves no purpose. *See Tallman v. City of Elizabethtown*, No. 2006-CA-00712, 2007 WL 3227599 (Ky. Ct. App. Nov. 2, 2007), *review denied*, Sept. 10, 2008.

In *Tallman*, a decedent's estate and minor children filed federal and state law claims in federal court against various government defendants for a fatal police shooting. *Id.* at *1. The federal court dismissed all claims. *Id.* After the relevant limitations period had run, the minors filed claims for loss of parental consortium in state court. *Id.* The Circuit Court granted summary judgment to defendants. On appeal, the Kentucky Court of Appeals found the minors' claims time-barred because, although generally "KRS 413.170(1) tolls the limitations period of a minor's state law claim until the minor reaches majority," in *Tallman*, "the children's claims were prosecuted on their behalf by their mother, as guardian and next friend." *Id.* at *3. Thus, given the children's ability to prosecute their claims through their mother demonstrated by "the procedural history of this case, [the court was] not persuaded that KRS 413.170(1) tolled the children's claims . . . ." *Id.*

*Tallman*'s refusal to apply the tolling statute "in light of the procedural history" of that case is consistent with Kentucky law. Indeed, KRS 446.080(1) requires that "[a]ll statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature." The object of tolling provisions such as KRS 413.170 is to protect parties with incapacities who cannot sue, so they can sue when the incapacity is removed. Where the incapacity

ceases, the statute's protections cease. *See Lowther v. Moss*, 39 S.W.2d 501, 503 (Ky. Ct. App. 1931) (where "the reason for complying with [Code] provisions . . . does not exist, because the purpose of the Legislature in enacting the Code rule . . . was complied with," rule's "requirements would also necessarily cease"); *see also Asher v. Hartlage*, 336 S.W.2d 335 (Ky. Ct. App. 1960) (where grantor was "mentally competent" the "reason for the rule" that a grantor's "mental weakness" shifts the burden to the grantee "ceases to exist and it has no application"). Indeed, this Court has recognized the policy underpinning the tolling statute and issued an opinion consistent with *Tallman*'s reasoning. *Holbert v. West*, 730 F.Supp. 50, 54 (E.D. Ky. 1990) (holding that "statute of limitations is not tolled for married infants by virtue of their minority" and barring untimely civil action on that basis).

These principles apply here to bar Sandmann's claim. The purpose of the tolling statute has no application given the "procedural history of this case" that evidences no incapacity. *Tallman*, 2007 WL 3227599, at *3. To the contrary, Sandmann has been litigating claims arising out of the exact same confrontation with Phillips that is the subject of the Rolling Stone Article since February 2019. (Doc. 1, ¶ 30.) Sandmann was also very close to the age of eighteen when he filed his case against Rolling Stone. According to the Complaint, Sandmann was sixteen years old at the time of the January 18, 2019 encounter with Phillips, which means he was seventeen when he filed this case and was soon to turn eighteen. (Doc. 1, ¶ 206.). The statute does not apply here because Sandmann is close to the age of majority and he has demonstrated his ability to timely file other similar lawsuits, through his parents. At no time within the limitations period, however, did he sue Rolling Stone.

Kentucky law did not permit the minors in *Tallman* to litigate their case in federal court, lose, and then refile in state court with the protection of the tolling statute. So too here: Sandmann cannot litigate his case—arising from the same incident and statements—in this Court, and then,

22

after testing his claims against numerous defendants, sue even more defendants after the one-year limitations has run. The tolling statute is meant to protect minors who cannot litigate, not minors pursuing creative litigation strategies. Because Sandmann's previous cases—coupled with this one—demonstrate that he neither suffered nor suffers any incapacity, his claims are not timely.

Although several federal district courts declined (incorrectly) to follow *Tallman*,[9] this Court should apply state law as pronounced by the Kentucky Court of Appeals in that case. The Sixth Circuit has instructed: "'a federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court.'" *Mroz v. Lee*, 5 F.3d 1016, 1019 (6th Cir. 1993) (citation omitted); *see also Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 932 (6th Cir. 2020). This is true "even though [the federal court] thinks the rule is unsound in principle or that another is preferable," *Mroz*, 5 F.3d at 1019, because "[a]fter a state supreme court's decisions, 'intermediate state appellate court decisions constitute the next best indicia of what state law is,'" *United States v. Burris*, 912 F.3d 386, 398 (6th Cir. 2019) (citation omitted). A federal court may depart from an intermediate appellate court's ruling only where "it is convinced"—not by its own reasoning—but by "*persuasive data* that the highest court of the state would decide otherwise."[10] *Mroz*, 5 F.3d at 1019 (emphasis added). None of the courts that rejected *Tallman* applied these principles, so they erred in rejecting it. *See, e.g.*, *Bradford*, 767 F.Supp.2d at 752-53.

Equally important, no data—let alone "persuasive" data—exists to conclude the Kentucky Supreme Court would reject *Tallman*. Thus, this Court should adhere to it. *See Davis v. Marriott Intern., Inc.*, 6th Cir. No. 04-4156, 2005 WL 2445945, *2-3 (finding court obliged to follow the one Ohio intermediate appellate court that had addressed the issue). Indeed, the Kentucky Supreme

---

[9]     *See, e.g.*, *Bradford v. Bracken Cty.*, 767 F.Supp.2d 740, 752-53 (E.D. Ky. 2011) (collecting cases).

[10]     This is so regardless of whether the decision is published. *Aarti Hosp., LLC v. Grove City*, 350 F. App'x 1, 8 (6th Cir. 2009).

Court's decision not to review *Tallman* militates in favor of its continued application. *See Lukas v. McPeak*, 730 F.3d 635, 638 (6th Cir. 2013) (holding intermediate appellate court precedent "particularly persuasive" where state supreme court "refused to review the decision."); *accord Deane v. Quest Diagnostics Inc.*, No. 1:18-CV-880, 2019 WL 2569918, *1 (S.D. Ohio Jun. 21, 2019) (Bertelsman, J.) (observing that "binding effect of state appellate decision on federal court making an *Erie* 'guess' is greater where state's highest court has refused to review that decision") (citation omitted). Although the mere *right to proceed* through a guardian or next friend does not eliminate tolling protections, actual prosecution of the lawsuit demonstrates the absence of a reason for application of the statute. *Compare Newby's Adm'r v. Warren's Adm'r*, 277 Ky. 338, 126 S.W.2d 436 (Ky. 1939) *with Tallman* 2007 WL 3227599, at *3. Here, as in *Tallman*, Sandmann *actually has proceeded* to bring claims by a next friend, and so cannot claim the protections of the tolling statute.  Accordingly, this case should also be dismissed because Sandmann failed to timely bring his claim within one year of the Rolling Stone Article and the reason for applying the tolling provision of KRS 413.170(1) does not exist in this case.

## IV.   CONCLUSION

The statements at issue are not defamatory and are constitutionally protected opinions as a matter of law.  Sandmann's claim is also untimely.  For all these reasons, the Court should dismiss the Complaint with prejudice.

Respectfully submitted,

/s/ *Kevin T. Shook*
Kevin T. Shook (*pro hac vice*)
FROST BROWN TODD LLC
10 West Broad Street
Columbus, OH 43215-3484
Phone: 614-464-1211
Fax: 614-464-1737
kshook@fbtlaw.com
rgoellner@fbtlaw.com

Theresa A. Canaday (KBA# 88607)
Samuel W. Wardle (KBA# 97365)
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202-3363
Phone: 502-589-5400
Fax:  502-581-1087
tcanaday@fbtlaw.com
swardle@fbtlaw.com

Michael E. Nitardy (KBA# 91613)
FROST BROWN TODD LLC
7310 Turfway Road, Suite 210
Florence, KY  41042
Phone: 859-817-5900
Fax: 859-283-5902
mnitardy@fbtlaw.com

Ryan W. Goellner (*pro hac vice*)
FROST BROWN TODD LLC
301 East Fourth Street, Suite 3300
Cincinnati, OH  45202
Phone: 513-651-6800
Fax: 513-651-6981
rgoellner@fbtlaw.com

*Counsel for Defendants, Rolling Stone, LLC and Penske Media Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2020, I electronically filed the foregoing document with the clerk of the court by using the CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by e-mail or first-class mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

Todd V. McMurtry (KBA# 82101)
Kyle M. Winslow (KBA# 95343)
HEMMER DEFRANK WESSELS, PLLC
250 Grandview Drive, Suite 500
Ft. Mitchell, KY  41017
Phone: 859-344-1188
Fax: 859-578-3869
tmcmurtry@hemmerlaw.com
kwinslow@hemmerlaw.com

L. Lin Wood
L. LIN WOOD, P.C.
1180 W. Peachtree Street, Suite 2040
Atlanta, GA 30309
Phone: 404-891-1402
Fax: 404-506-9111
lwood@linwoodlaw.com

*/s/ Kevin T. Shook*
*Counsel for Defendants, Rolling Stone, LLC*
*and Penske Media Corporation*

0144420.0730688   4835-7347-1417