# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION
### AT COVINGTON

NICHOLAS SANDMANN, by and
through his parents and natural guardians,
TED SANDMANN and JULIE
SANDMANN,

      Plaintiff,

v.

THE NEW YORK TIMES COMPANY
d/b/a THE NEW YORK TIMES,

      Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

CASE NO. 2:20-CV-00023-WOB-CJS


NICHOLAS SANDMANN, by and
through his parents and natural guardians,
TED SANDMANN and JULIE
SANDMANN,

      Plaintiff,

v.

CBS NEWS, INC., et al.,

      Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

CASE NO. 20-CV-00024-WOB-CJS


NICHOLAS SANDMANN, by and
through his parents and natural guardians,
TED SANDMANN and JULIE
SANDMANN,

      Plaintiff,

v.

ABC NEWS, INC., et al.,

      Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

CASE NO. 2:20-CV-00025-WOB-CJS

| | | |
|---|---|---|
| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | : : : : : | CASE NO. 2:20-CV-00026-WOB-CJS |
| Plaintiff, | : : | |
| v. | : : | |
| GANNETT CO., INC. AND GANNETT SATELLITE INFORMATION NETWORK, LLC, | : : : : | |
| Defendants. | : : | |
| | | |
| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | : : : : : | CASE NO. 2:20-CV-00027-WOB-CJS |
| Plaintiff, | : : | |
| v. | : : | |
| ROLLING STONE, LLC, et al., | : : | |
| Defendants. | : : | |

## DEFENDANTS' JOINT MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Robert B. Craig
TAFT STETTINIUS & HOLLISTER LLP
50 East RiverCenter Blvd., Suite 850
Covington, KY 41011-1683
Phone: (859) 547-4300
Fax: (513) 381-6613
craigr@taftlaw.com

Nathan Siegel (*pro hac vice*)
Meenakshi Krishnan (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1301 K St. NW, Suite 500
Washington, DC 20005
Phone: (202) 973-4237
Fax: (202) 973-4437
nathansiegel@dwt.com
meenakshikrishnan@dwt.com

*Counsel for Defendants*
*ABC News, Inc., ABC News Interactive,*
*Inc., and The Walt Disney Company*

J. Stephen Smith (KBA 86612)
Darren W. Ford (KBA 95373)
GRAYDON HEAD & RITCHEY LLP
2400 Chamber Center Drive
Suite 300
Ft. Mitchell, KY 41017
Phone: (859) 578-3070
Fax: (859) 578-3071
ssmith@graydon.com
dford@graydon.com

Jared A. Cox
DENTONS BINGHAM GREENEBAUM LLP
101 South Fifth Street, Suite 3500
Louisville, KY 40202
Phone: (502) 589-4200
Jared.cox@dentons.com

John C. Greiner (*pro hac vice*)
GRAYDON HEAD & RITCHEY LLP
312 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: (513) 629-2734
Fax: (513) 333-4316
jgreiner@graydon.law

*Counsel for Defendant The New York
Times Company d/b/a The New York Times*

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
Phone: (312) 876-8000
Natalie.spears@dentons.com
Gregory.naron@dentons.com

Jessica Laurin Meek (*pro hac vice*)
DENTONS BINGHAM GREENEBAUM
LLP
10 West Market Street, Suite 2700
Indianapolis, IN 46204
Phone: (317) 635-8900
Jessica.meek@dentons.com

*Counsel for Defendants CBS News Inc.,
ViacomCBS Inc., and CBS Interactive
Inc.*

Jon L. Fleischaker
Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD LLP
710 W. Main St., 4th Floor
Louisville, KY 40202
(502) 540-8280
jfleischaker@kaplanjohnsonlaw.com
mabate@kaplanjohnsonlaw.com

Michael J. Grygiel (*pro hac vice*)
Cyndy E. Neidl (*pro hac vice*)
Kelly L. McNamee (*pro hac vice*)
GREENBERG TRAURIG, LLP
54 State Street, 6th Floor
Albany, New York 12207
(518) 689-1400
grygielm@gtlaw.com
neidlc@gtlaw.com
mcnameek@gtlaw.com

*Counsel for Defendants Gannett Co., Inc.
and Gannett Satellite Information
Network, LLC*

Theresa A. Canaday
Samuel W. Wardle
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202
Phone: (502) 589-5400
Faz: (502) 587-1087
tcanaday@fbtlaw.com
swardle@fbtlaw.com

Michael E. Nitardy
FROST BROWN TODD LLC
7310 Turfway Road, Suite 210
Florence, KY 41042
Phone: (859) 817-5900
Fax: (859) 283-5902
mnitardy@fbtlaw.com

Kevin T. Shook (*pro hac vice*)
FROST BROWN TODD LLC
10 West Broad Street
Columbus, OH 43215
Phone: (614) 464-1211
Fax: (614) 464-1737
kshook@fbtlaw.com

Ryan W. Goellner (*pro hac vice*)
FROST BROWN TODD LLC
301 East Fourth Street, Suite 3300
Cincinnati, OH 45202
Phone: (513) 651-6800
Fax: (513) 651-6981
rgoellner@fbtlaw.com

*Counsel for Defendants Rolling Stone, LLC and Penske Media Corporation*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

SUMMARY OF PRIOR PROCEEDINGS AND THESE SUMMARY JUDGMENT
      MOTIONS ............................................................................................................. 2

STATEMENT OF FACTS ................................................................................................ 4

    A.      Two Marches Are Held in Washington, D.C. .................................................... 4

    B.      A Small Group of Black Hebrew Israelites Disparage Multiple Groups and
             Persons Near the Lincoln Memorial ................................................................ 5

    C.      The Conflict Between the BHI and the CovCath Students .................................. 6

    D.      The Conflict Between the Students and the BHI Was Perceived Very
             Differently By Different People ........................................................................ 9

    E.      Phillips Tries to Calm the Situation With Song and Prayer ............................... 12

    F.      Phillips Approaches the CovCath Students ..................................................... 15

    G.      Phillips Tries to Exit and CovCath Students Move Aside to Let Him Pass,
             But Sandmann Decides to Send Phillips a Message by Standing in His
             Way ................................................................................................................. 18

    H.      Phillips Perceives that Sandmann Blocked Him ............................................... 22

    I.      Phillips and Sandmann Stand Face-to-Face For About Six Minutes ................... 27

    J.      The CovCath Students Disperse ...................................................................... 29

STANDARD OF REVIEW ............................................................................................. 30

ARGUMENT .................................................................................................................. 31

I.      THE BLOCKING STATEMENTS ARE PROTECTED OPINION ............................... 31

    A.      The Blocking Statements Reflected Phillips' Subjective Perspective. ................. 32

    B.      Phillips' Perception Was Supported By Disclosed Facts. ................................... 34

    C.      Sandmann's Amended Allegations Were Baseless Speculation. ......................... 36

II.      THE BLOCKING STATEMENTS ARE SUBSTANTIALLY TRUE. .......................... 43

    A.      The First Amendment Places the Burden on Sandmann to Show That the
             Blocking Statements Were Materially False. ..................................................... 44

B.      Sandmann Cannot Meet His Burden of Showing a Genuine Dispute That
        the Blocking Statements Were Materially False.................................................. 45

CONCLUSION.................................................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Alexander v. CareSource*,
    576 F.3d 551 (6th Cir. 2009) ................................................................31

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).............................................................................30

*Bass v. Robinson*,
    167 F.3d 1041 (6th Cir. 1999) .............................................................30

*Bennett v. Cisco Sys., Inc.*,
    63 Fed. App'x 202 (6th Cir. 2003) ......................................................44

*Blessing v. Cable News Network, Inc.*,
    No. 220CV0015, 2020 WL 7647530 (E.D. Ky. Dec. 23, 2020)............32

*Boyd v. Baeppler*,
    215 F.3d 594 (6th Cir. 2000) ...............................................................30

*Catalanello v. Kramer*,
    18 F. Supp. 3d 504 (S.D.N.Y. 2014).....................................................32

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..............................................................................30

*Clark v. Viacom Int'l, Inc.*,
    617 F. App'x 495 (6th Cir. 2015) ...............................................31, 43, 44

*Compuware Corp. v. Moody's Invs. Servs., Inc.*,
    499 F.3d 520 (6th Cir. 2007) ...............................................................32

*Croce v. Sanders*,
    843 F. App'x 710 (6th Cir. 2021) ...................................................32, 36

*Hammer v. City of Osage Beach, MO*,
    318 F.3d 832 (8th Cir. 2003) ...............................................................36

*Hildebrant v. Meredith Corp.*,
    63 F. Supp. 3d 732 (E.D. Mich. 2014)..................................................48

*Lassiter v. Lassiter*,
    456 F. Supp. 2d 876 (E.D. Ky. 2006), *aff'd*, 280 Fed. App'x 503 (6th Cir.
    2008) ...............................................................................................31, 32

*Lindsay v. Yates*,
    578 F.3d 407 (6th Cir. 2009) ........................................................................30

*Loftus v. Nazari*,
    21 F. Supp. 3d 849 (E.D. Ky. 2014) ...........................................................32

*Macineirghe v. County of Suffolk*,
    No. 13-cv-1512 (ADS)(SIL), 2015 WL 4459456 (E.D.N.Y. July 21, 2015) .........................36

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ........................................................................................36

*Nichols v. Moore*,
    477 F.3d 396 (6th Cir. 2007) ......................................................................44

*Novotny v. Elsevier*,
    291 F. App'x 698 (6th Cir. 2008) ...............................................................45

*Parry v. Mohawk Motors of Michigan, Inc.*,
    236 F.3d 299 (6th Cir. 2000) ......................................................................44

*Roeder v. Am. Postal Workers Union, AFL-CIO*,
    180 F.3d 733 (6th Cir. 1999) ......................................................................31

*Sandmann v. WP Co. LLC*,
    401 F. Supp. 3d 781 (E.D. Ky. 2019) ............................................... *passim*

*Tannerite Sports, LLC v. NBCUniversal Media LLC*,
    135 F. Supp. 3d 219 (S.D.N.Y. 2015), *aff'd sub nom. Tannerite Sports, LLC v.*
    *NBCUniversal News Grp.*, 864 F.3d 236 (2d Cir. 2017)..................................46, 48

*Trover v. Kluger*,
    No. 4:05-cv-014-H, 2007 WL 528419 (W.D. Ky. Feb. 14, 2007) .........................45

*Underwager v. Channel 9 Austl.*,
    69 F.3d 361 (9th Cir. 1995) ........................................................................32

**State Cases**

*Bell v. Courier-Journal & Louisville Times Co.*,
    402 S.W.2d 84 (Ky. 1966).............................................................................44

*Cromity v. Meiners*,
    494 S.W.3d 499 (Ky. 2015)..........................................................................31

*Estepp v. Johnson Cty. Newspapers, Inc.*,
    578 S.W.3d 740 (Ky. App. 2019) ...........................................................44, 46

iv

*Fry v. Lee*,
 408 P.3d 843 (Colo. Ct. App. 2013) ........................................................48

*Harrison v. Chicago Sun-Times, Inc.*,
 793 N.E.2d 760 (Ill. Ct. App. 2003) ......................................................48

*Nat'l Coll. of Kentucky, Inc. v. WAVE Holdings, LLC*,
 536 S.W.3d 218 (Ky. Ct. App. 2017) .....................................................44

*Taxpayers' League of Bell Cty. v. Sun Publ'g Co.*,
 75 S.W.2d 564 (Ky. 1934) ......................................................................46

*Welch v. American Publ'g Co. of Kentucky*,
 3 S.W.3d 724 (Ky. 1999) .........................................................................31

## INTRODUCTION

These summary judgment motions follow from this Court's prior treatment of allegedly actionable statements spoken by Nathan Phillips ("the Blocking Statements") that are at issue in each of the defamation suits maintained by Plaintiff Nicholas Sandmann against each Defendant. After initially granting *The Washington Post*'s motion to dismiss in Sandmann's case, the Court reviewed additional allegations proffered by Sandmann and granted reconsideration limited to holding that discovery should be had regarding the Blocking Statements and their context, and it would then consider them on summary judgment. The Court re-affirmed that holding when denying these Defendants' motions to dismiss.

That discovery is now complete, and the record fully supports this Court's initial determination that the Blocking Statements constitute non-actionable opinion. Their context reflected a situation in which different people had distinct and inherently subjective perceptions of the same events, and Sandmann admits that Phillips could have perceived Sandmann to be intentionally obstructing Phillips' way forward. Furthermore, the facts that Phillips disclosed to support his perception have proven to be accurate. Moreover, the additional allegations Sandmann made in asking the Court to reconsider its initial dismissal of his case against the *Post*, which he repeated in Complaints against these Defendants, have proven to be baseless.

Even if the Court were to determine that the Blocking Statements are statements of fact rather than opinion, summary judgment would still be warranted because the undisputed facts show that Sandmann cannot meet his burden to demonstrate that the Blocking Statements were materially false. Put another way, Phillips' perception that Sandmann blocked him was substantially correct. The record shows that before they came face-to-face, Sandmann saw that Phillips was moving forward through the crowd of students and other students were moving out of his way. But Sandmann thought Phillips was trying to intimidate the students, so he decided

not to move aside and instead to stand in Phillips' way.  Sandmann thought that by doing so he

was standing up for the school and sending Phillips a message that Covington Catholic students

cannot be intimidated.  Summary judgment is therefore also warranted in each of Sandmann's

pending cases because the Blocking Statements are substantially true.

## SUMMARY OF PRIOR PROCEEDINGS AND THESE SUMMARY JUDGMENT MOTIONS

In *Sandmann v. WP Co. LLC*, 401 F. Supp. 3d 781 (E.D. Ky. 2019) ("*Post*"), the Blocking

Statements that the Court considered were the following:

> It was getting ugly, and I was thinking: "I've got to find myself an
> exit out of this situation and finish my song at the Lincoln
> Memorial," Phillips recalled. "I started going that way, and that guy
> in the hat stood in my way and we were at an impasse.  He just
> blocked my way and wouldn't allow me to retreat.

*Id.* at 792 (emphasis omitted).  With respect to the Blocking Statements, this Court

initially found:

> [E]ven if these statements could be construed to refer to Sandmann,
> they do not convey "actual, objectively verifiable facts."  How
> Phillips "felt" is obviously subjective, and whether Phillips was
> "swarmed" or "blocked" is simply not "capable of being proved
> objectively incorrect."
> . . .
> Sandmann admits he was standing in silence in front of Phillips in
> the center of a confusing confrontation between the students and the
> Indigenous Peoples group.  Sandmann's intent, he avers, was to
> diffuse the situation by remaining motionless and calm.  Phillips,
> however, interpreted Sandmann's action (or lack thereof) as
> blocking him and not allowing him to retreat.
>
> In statement 10 [the Blocking Statements], Phillips disclosed the
> reasons for his perception: the size of the crowd, the tense
> atmosphere, taunts directed at his group, and his memories of past
> discrimination.  There were no undisclosed facts, and the reader was
> in as good a position as Phillips to judge whether the conclusion he
> reached – that he was "blocked" – was correct.

*Id.* at 792-93 (citations omitted).  In granting reconsideration, the Court noted that Sandmann's proposed amended complaint in the *Post* case "ma[de] specific allegations concerning the state of mind of Phillips" and alleged "that Phillips deliberately lied" concerning the events at issue.  *Post*, Doc. 64 at 2.  After reviewing those additional allegations, the Court determined "that 'justice requires' that discovery be had regarding these statements [the Blocking Statements] and their context.  The Court will then consider them anew on summary judgment."  *Id.*

Sandmann then sued five more media defendants, each in separate cases.  In denying motions to dismiss filed by each of these Defendants based on the pleadings, the Court noted that all the articles and/or broadcasts at issue included the Blocking Statements either *verbatim* or other materially similar statements made by Phillips.  The Court held, based solely on the allegations of the Complaints, that Sandmann had sufficiently alleged that the Blocking Statements are capable of a defamatory meaning, for the same reason it stated in the *Post* (and *CNN* and *NBC*) cases.  The Court did not also address whether the Blocking Statements are non-actionable opinion, but rather, as in those preceding cases, ruled that discovery was warranted on both Sandmann's claims and the defenses thereto.[1]  At the Parties' request, the Court subsequently entered a Scheduling Order directing them to first conduct discovery limited to the facts pertaining to the encounter between Sandmann and Phillips, to be followed by summary judgment motions limited to whether the Blocking Statements are "true or substantially true, or otherwise not actionable based on the undisputed facts developed during discovery and the issues defined in the Court's prior decisions."[2]  A case will only proceed to a second phase of discovery and motion practice if that defendant's first-phase summary judgment motion is denied.  *Id.*

---

[1] *See ABC*, Doc. 36; *CBS*, Doc. 33; *N.Y. Times*, Doc. 27; *Rolling Stone*, Doc. 35; *see also Gannett*, Doc. 39.  The Court also held that Sandmann's claims were not time-barred.  *Id.*

[2] *ABC*, Doc. 49; *CBS*, Doc. 44; *N.Y. Times*, Doc. 38; *Rolling Stone*, Doc. 45; *Gannett*, Doc. 50.

After completing this phase of discovery, based on the Parties' agreement, Defendants are filing a Joint Memorandum addressing all the facts and legal arguments concerning the Blocking Statements that the Defendants believe to be common to all of Sandmann's defamation cases. Accordingly, each Defendant is filing this Joint Memorandum in each of their respective cases. In addition, each Defendant is also separately filing a (shorter) memorandum of law addressing any additional arguments that are specific to that Defendant's publications.

**STATEMENT OF FACTS**

Because the Court ordered discovery regarding the Blocking Statements and their context, this Statement of Facts presents the broader context of the events of January 18, 2019. While Defendants believe that all the facts below are not subject to any genuine dispute, the facts that are most directly material to whether the Blocking Statements are actionable are narrower and referenced in the Argument section. Because the Defendants are filing both this Joint and separate memoranda that may cite to these facts, for ease of reference the paragraphs below are numbered.

**A.      Two Marches Are Held in Washington, D.C.**

On January 18, 2019, two marches took place in Washington, D.C.: the March for Life and the Indigenous Peoples March. The cultural backgrounds and perspectives of some of the people who attended those respective events, and then later were involved in the incident that gives rise to this case, were quite different.

1.      Among the attendees at the annual March for Life were a large group of students from Covington Catholic High School ("CovCath"), including Plaintiff Nicholas Sandmann. Ex. B, Dep. Tr. of Nicholas Sandmann ("S.D.") at 35:3-21, 36:4-18. The March for Life began in the morning. The students were then allowed to explore Washington, D.C. on their own, and were

4

told to arrive in front of the Lincoln Memorial by 5:00 p.m. to board buses to return home.  S.D. 48:3-6; *see, e.g.*, Docs. 61-62, Video 4 at 05:38.[3]

2.      The Indigenous Peoples March ("March") was sponsored by an organization called the Indigenous Peoples Movement.  Declaration of Nathan Phillips ("Phillips Decl.") ¶ 2.  It was held for the first time in 2019 to celebrate unity among indigenous peoples and raise awareness about injustices against them.  *Id.*

3.      Nathan Phillips had no role in planning or organizing the March, and he attended at the invitation of a friend.  *Id.*  The March began that morning and ended in the afternoon with a round dance, a traditional Native American dance that is performed in a circle.  The round dance was accompanied by hand drums, played to express unity and togetherness.  Declaration of Marcus Frejo ("Frejo Decl.") ¶ 6; Declaration of Anthony Tee ("Tee Decl.") ¶ 5; Phillips Decl. ¶ 3; Video 4 at 33:45-34:05.

## B.      A Small Group of Black Hebrew Israelites Disparage Multiple Groups and Persons Near the Lincoln Memorial

4.      On the afternoon of January 18, a group of around five to six men, who call themselves Black Hebrew Israelites (the "BHI"), were standing in the vicinity of the Lincoln Memorial and proselytizing.  Video 4 at 00:00-00:11.  While the March was still taking place, a BHI speaker frequently lobbed invective about Native American religion and culture at its participants.  *See, e.g.*, Video 4 at 00:14-00:30; *see also id.* at 34:33-34:57 ("…You worship the eagle, you worship the phoenix, you worship the buffalo . . . These are the idols you been

---

[3] The Parties in all these cases have stipulated to the authenticity of 20 videos, including 18 depicting events that day, and also waived any hearsay objections to them.  Each video is identified by a number (Video 1, Video 2, etc.) and contained on a thumb drive that, for purposes of the record, has been filed with that Stipulation in each case.  For ease of reference, this Joint Memorandum cites to the docket numbers in Sandmann's case against ABC, which are Doc. 61 (the Stipulation) and Doc. 62 (the thumb drive) in that case.  The rest of this Joint Memorandum cites to the Videos on that thumb drive simply by their number (Video 1, Video 2, etc.).

worshipping. Your idols can't save you.  A damn buffalo can't save you."); *id.* at 37:22-37:27 ("There's Uncle Toms. You an Uncle Tomahawk.").  The BHI also disparaged Jews, Catholics, gay persons, other Black persons, Republicans, Democrats, and many others.  S.D. 67:10-68:1; 77:9-78:4.

**C.     The Conflict Between the BHI and the CovCath Students**

5.     CovCath students started arriving in the vicinity of the Lincoln Memorial well before 5 p.m., and small groups of them began to approach and observe the BHI.  *See* Video 4 at 05:36-05:45; 38:17-38:46; 45:10-45:14; 49:49-50:08.   When a BHI speaker noticed students watching, he would often disparage them, including frequently denigrating then-President Trump and the Make America Great Again ("MAGA") hats many of the students were wearing.  Video 4 at 29:20-29:36.  Initially, students just watched and then walked away.  *See* Video 4 at 11:19-12:07; S.D. 54:12-55:21.

6.     But as the afternoon wore on, some CovCath students began to respond to the BHI. For example, one student responded to statements denouncing President Trump by pulling out a water bottle, including one with a "Trump" logo on it, and holding it up at the BHI:




Video 4 at 44:39; *see* Video 4 at 38:00-38:36, 43:56-44:39; S.D. 56:12-56:18, 60:23-62:1 & Ex. C. (S.D. Ex. 4).   Over time, the size of groups of students approaching the BHI (which sometimes also included students from other schools) grew larger.  *Compare* Video 4 at 38:17, *with* 49:58-50:08; S.D. 69:08-70:22.  Still, after listening to a BHI speaker hurling insults at them, the students would typically just walk away, and the BHI would then turn their attention to someone else. Video 4 at 50:02-50:53 (students walk away after BHI speaker calls them "future school shooters"); S.D. 71:11-73:15.

7.     Sandmann arrived in the area around 4:30 p.m.  S.D. 48:21-49:3, 74:7-74:14; Video 4 at 53:34.  Over the course of the next 20 minutes, many more CovCath students arrived and they began gathering together on and near a flight of steps leading to the Lincoln Memorial.  Video 4 at 1:00:21-1:00:23; 1:06:18-1:06:25; S.D. 47:1-24; 48:11-50:14.  For most of that time, the BHI stood with their backs to the students and did not address them.  Video 4 at 1:00:256-1:01:15; 1:02:08-1:04:18; 1:06:19-1:06:45.

8.     But about five minutes before Nathan Phillips approached the students, one of the BHI speakers turned to face the students and began flinging more insults.  *Id.* at 1:07:37-1:07:58. Among other things he said, "This is what make America great looks like," and then asked the crowd, "When was it great, I dare you to say it?"  *Id.* at 1:07:57-1:08:08.  A young man standing at the edge of the students on the steps (who may not have been a CovCath student) responded to the speaker with a racial insult—a reference to "lynchings"—and multiple people nearby (including some who appear to be CovCath students) laughed.  Video 4 at 1:08:05-1:08:12; S.D. 83:1-86:3.  The BHI speaker responded: "Exactly, since it started, since you had us in slavery you bastards," to which the same young man responded, "That's right."  Video 4 at 1:08:12-1:08:17. Another CovCath student also heard a classmate lob another insult at the BHI, saying "Can you

7

even read?"  Declaration of Sam Brockett ("Brockett Decl.") ¶¶ 6-7, *id.* Ex. A at 9:53-10:56; Ex. A at 4.[4]

9.      At this point, a few CovCath students requested and received permission from a chaperone to try to "drown out" the BHI by using cheers intended for school sporting events.  S.D. 87:23-89:1; 119:15-17; ABC Compl. ¶ 38.  The first cheer ended with the students pointing at the BHI, waving their thumbs down and booing the BHI.  S.D. 105:8-25; Video 5 at 00:00-00:36.  The BHI insulted the students in return.  Video 4 at 1:08:58-1:09:01 ("Y'all sound like a bunch of dogs, a bunch of hyenas").

10.     The BHI speaker then pointed at the students and said, "There's a reason why y'all outnumber us but y'all keep y'alls distance."  Video 5 at 00:50-01:07; S.D. 113:20-114:12.  A CovCath student then took another water bottle with the Trump logo, rolled it on the ground to a spot that was closer to the BHI, and ran out to pick it up and bring it back.  Video 4 at 1:09:13-1:09:33; Video 5 at 00:50-1:02;  S.D. 106:9-110:7, 111:25-112:4.  While he did that, some students shouted, "Trump water, Trump water."  Video 5 at 00:50-01:02; S.D. 111:3-14; 112:12-17.  Other students shouted "Trump, Trump."  Video 5 at 01:07-01:15.

11.     The students then began "cheering" even more loudly.  One student ran down the steps, removed three layers of clothing, and stood in front of the crowd bare-chested, flexing his muscles while pumping his fists and shouting.  The students yelled, stomped on the ground, and faced the BHI with their muscles flexed and fists clenched.  *See* Video 4 at 1:09:48-1:10:20; Video 5 at 1:24-1:54.

---

[4] For the convenience of the Court, Defendants have prepared a transcript of the audio interview recording that is attached to the Brockett Declaration. That transcript is attached as Exhibit A.



Video 4 at 1:54.  This was known to the students as the "sumo cheer."  S.D. 27:19-29:15; 95:4-95:11; 118:1-25.

12.     As more students arrived, they edged physically closer to the BHI.  Video 5 at 2:57-3:20; S.D. 126:2-17.  As they got closer, the students continued to shout while jumping up and down, and one of the students began waving a stick in the air.  Video 5 at 02:30-02:37; Video 4 at 1:10:49-1:10:52.  This was not an organized cheer.  S.D. 122:2-123:8.

13.     Several young men joined the students by waving their fists in the air and yelling "Trump, Trump."  Video 5 at 02:37-02:44; S.D. 123:9-125:8.  The CovCath students then gathered in a circle and knelt on one knee or squatted, while a few students stood to lead groups who jumped up and down and shouted loudly, which among themselves was known as the "Victory is our Battle Cry" cheer.  Video 5 at 03:20-03:50; S.D. 33:8-34:1,131:24-132:11.

**D.     The Conflict Between the Students and the BHI Was Perceived Very Differently By Different People**

The interaction between the students and the BHI was perceived quite differently by those present in the area that day.

9

14.   To Sandmann, the BHI's behavior was a "culture shock."  S.D. 51:4-52:9.  He felt physically threatened by the BHI and feared that a fight might break out.  S.D. 98:6-99:5.  And though there were more than 100 teenagers and only a half-dozen BHI, Sandmann felt the BHI "outmatched" the students because "they looked strong to me" and seemed more physically "developed and matured" than the students.  S.D. 99:6-100:22.

15.   In Sandmann's view, it would also have been "pretty obvious" to every person who happened to be on the Mall that day that the students were doing school cheers, because in his experience "high school games are very common," and sports are not something that is possible to "avoid."  S.D. 94:23-96:13.  In Sandmann's opinion, there was nothing provocative about the "cheers," or even students rolling a water bottle with a Trump logo towards the BHI while chanting "Trump Water."  To Sandmann, that was just "all boys school humor," and he did not perceive it as taunting the BHI.  S.D. 112:5-113:5.

16.   Sandmann acknowledges, however, that "maybe not" everyone in the area that day would have recognized the sumo cheer as a school cheer.  S.D. 119:4-10.  Rather, he acknowledges that "a person watching over 100 white teenage boys responding to [the] BHI by yelling loudly, jumping up and down with clenched fists held toward them" could have perceived the students to be expressing hostility and aggression towards the BHI.  S.D. 119:15-120:9.

17.   At least one CovCath student was uncomfortable with the "cheers."  As he explained later to an investigator hired by the Diocese of Covington, he saw "two really divided groups, divided by race, divided by political views and stuff."  Brockett Decl. ¶¶ 6-7, Brockett Decl. Ex. A at 13:24-14:43; Ex. A at 5.  He thought it would have been better to just "leave it be" rather than respond to the BHI, let alone with raucous chants.  Brockett Decl. Ex. A at 7:12-7:36; Ex. A at 3.  He thought his classmates' response could provoke a fight and that the school

chaperones who were there should have intervened to "stop it from escalating."   Brockett Decl. Ex. A at 12:30-13:01; Ex. A at 5.   He and a couple of friends therefore walked away from the group rather than join in.   Brockett Decl. Ex. A at 5:13-6:39; Ex. A at 3.

18.     The Lincoln Memorial is a major tourist attraction, and the clash between the BHI and the CovCath students took place in full public view.   One person who was in the area at that time was Marcus Frejo, a musician who had driven to the March from his home in Oklahoma City.   After the March ended, he stayed on the Mall a little longer just to "enjoy the positive, spiritual energy [he] was feeling" at the conclusion of the March.   Frejo Decl. ¶¶ 4, 7.

19.     Frejo watched the escalating confrontation between the students and the BHI with growing alarm.   *Id.* ¶¶ 7-10.   He did not perceive what the students were doing to be school cheers, but rather saw aggressive shouts and physical gestures that to him seemed intended to taunt the BHI.   *Id.*   He perceived the "sumo cheer" to be an appropriated version of the haka, a traditional dance performed by the Maori of New Zealand, which he felt was insulting to indigenous cultures. *Id.* ¶ 9.

20.     Another person watching from a different spot was Anthony Tee, a friend of Frejo's and also a musician, who had also driven to the March from Oklahoma City.   Tee Decl. ¶ 4.   To Tee, the behavior of the BHI was not a culture shock at all.   He had encountered BHI street proselytizers before, and when the BHI had been disparaging Native Americans earlier, he briefly tried to reason with one of them.   *Id.* ¶¶ 4-6.   More shocking to Tee was the way the students were responding.   Tee teaches music to teenagers, but he did not perceive what the students were doing to be school cheers.   Rather, he perceived the students to be engaging in aggressive machismo.   He thought the students probably meant no harm, but he feared their behavior could provoke a

11

response from the BHI that could lead to students getting hurt.  He was upset that no adults stepped in to stop the students' behavior.  *Id.* ¶¶ 7-9.

21.     Alvaro Andrade also was in the area, having driven to the March from New Jersey. Declaration of Alvaro Andrade ("Andrade Decl.") ¶ 5.  He was familiar with the BHI, having seen members on the streets of New York.  *Id.*  Andrade saw what looked to him like a large group of white teenagers using shouts and clenched fists in a face-off with a small number of Black men and thought the situation "just needed one spark to detonate."  *Id.* ¶¶ 7-8.

22.     Nathan Phillips also was watching the escalating tension between the teenagers and the BHI.  Phillips Decl. ¶ 7.  He had noticed the BHI earlier when they were insulting Native Americans but had just ignored them.  *Id.* ¶ 4.  After the March ended, Phillips stayed in the area because he was helping clean up and waiting to meet up with others to go to dinner.  *Id.* ¶ 6. Phillips can be seen on videos standing in different places around that area.  Video 4 at 50:52-50:54; 57:16-57:19.

23.     What Phillips perceived were not school cheers, but rather a large and growing group of white teenagers screaming and seemingly acting physically aggressive, while edging closer to a few Black men who were insulting them.  Phillips Decl. ¶¶ 7-11.  To him, it brought to mind other historical images where large groups of white men gathered in opposition to those they felt had offended them, leading to physical violence against members of minority groups.  *Id.* ¶ 10.

**E.     Phillips Tries to Calm the Situation With Song and Prayer**

24.     As the confrontation seemed to grow more tense, Phillips verbalized to others standing nearby that somebody should do something about the tense situation.  Someone who Phillips did not know, who was wearing a red cap with the American Indian Movement logo, suggested to Phillips that he drum and sing to try to do something about the situation.  Even though

in his culture it is not standard to refuse such a request, at first Phillips hesitated.  *Id.* ¶ 12.  But Phillips' religious heritage had taught him that song and prayer can bring healing to people who are feeling anger and hatred, so to him the suggestion was a natural response to the scene he was witnessing, and he decided to follow it.  *Id.* ¶ 14.

25.     Andrade, who was standing nearby, made that suggestion to Phillips.  Andrade Decl. ¶¶ 7-9.  Andrade is a musician who performs Native music and shares the belief that song has the power to calm tense situations.  *Id.*  ¶ 8.  Andrade did not know Phillips, but he thought that as an elder, Phillips would be a natural person to try to defuse the situation.  *Id.*

26.     Tee was also standing nearby at the time.  Tee had earlier helped lead the round dance at the March by playing his drum.  Tee Decl. ¶ 5; Video 4 at 33:50.  Tee and Phillips did not know each other, but like Phillips, Tee believes that music has medicinal and spiritual power to bring calm.  Tee thought that Phillips playing the drum would be a natural and positive way to try to accomplish that, and so he gave Phillips his drum to use.  Tee Decl. ¶¶ 10-11; Phillips Decl. ¶ 13.

27.     Phillips took Tee's drum and began singing the American Indian Movement ("AIM") song, a traditional Native song that "expresses unity and can be used as a prayer."  Phillips Decl. ¶ 13.  In Phillips' culture, the drum is an instrument used to talk to a higher spiritual and religious power.  *Id.* ¶ 14.  Phillips initially sang while standing in the same place where he had been watching the confrontation between the students at BHI, which was off to the side at some distance away from both groups.  Video 17 at 00:00-01:07; Phillips Decl. ¶ 15.



Video 17 at 00:37.

28.     When Phillips began his prayer, Frejo was standing closer to the students and was one of many people in the area filming what was happening. Frejo Decl. ¶ 11; Video 4 at 1:09:39-1:09:45. Frejo saw that Phillips was singing with Tee's drum. Frejo did not know Phillips but recognized him because they had both attended a demonstration at the Standing Rock Indian Reservation several years earlier. Frejo, also a musician, likewise believes that song and prayer have the power to calm and restore balance to tense situations. Frejo Decl. ¶ 13. That is what he perceived Phillips to be doing, which Frejo thought was a positive response to the situation. And as Phillips was an elder, Frejo wanted to support and join him. *Id.*; Tee Decl. ¶ 12. Frejo was carrying his own drum in a backpack, so he approached Phillips and told Phillips he was going to sing with him. Frejo Decl. ¶ 14; Video 17 at 01:10-01:11. Frejo then moved forward, so that he and Phillips could be a little closer to the students and the BHI. Frejo Decl. ¶ 14; Video 17 at 01:11-01:28.

29.     A few other persons who had been standing nearby followed them. One was Ashley Bell, who came from Connecticut. Declaration of Ashley Bell ("Bell Decl.") ¶ 3. She had met Phillips at Standing Rock and had kept in touch with him since. *Id.* ¶ 4. She had watched the escalating confrontation and also perceived the students' behavior to be aggressive and

provocative. *Id.* ¶¶ 8-10, 12. She understood the AIM song to be a peaceful gesture, respected Phillips as her elder and followed him. *Id.* ¶¶ 11, 13.

30.    Another person who followed was Jon Stegenga, from South Carolina. He is a freelance photojournalist who was covering the March and did not know Phillips. Declaration of Jon Stegenga ("Stegenga Decl.") ¶¶ 2, 4-5, 8. Andrade also followed Phillips. He had brought his personal video camera to the March and filmed what was happening to have his own record of the experience. Andrade Decl. ¶¶ 10-11.

**F.    Phillips Approaches the CovCath Students**

31.    Once Frejo joined him, on the spur of that moment Phillips walked up to stand in front of the students, to place himself between them and the BHI. Phillips did not ask anyone to join him or to record anything on camera. Phillips Decl. ¶¶ 17, 33; Video 4 at 1:12:17-1:12:30; Video 17 at 1:28-1:32. Phillips hoped that praying in front of the students would help calm the situation. Phillips Decl. ¶ 17. Frejo, Andrade, and Bell were not expecting Phillips to walk up to the students, but they supported what they believed he was trying to do and continued following him as an elder. Frejo Decl. ¶ 15; Bell Decl. ¶ 13; Andrade Decl. ¶ 11. As a photojournalist, Stegenga followed to continue documenting whatever happened that day. Stegenga Decl. ¶ 9.

32.    When Phillips approached and faced the students, he had hoped they would respond with respect and decorum. Phillips Decl. ¶¶ 18, 20. Instead, he first noticed they were gathered in what looked to him like a huddle, which he thought indicated they might be planning to take some kind of action, like rushing the BHI:

15



Video 5 at 3:44.  And when Phillips did approach, most of the students immediately responded by dancing, hooting, and laughing.  *E.g.*, Video 5 at 4:23-5:10; Video 17 at 2:00-2:45.  Many students then raised and lowered their arms in a "tomahawk chop" and yelled out the cheer that traditionally accompanies the tomahawk chop at sports games involving some teams with Native American mascots.  Video 2 at 00:24-00:33; Video 4 at 1:14:07-1:14:15; S.D. 152:13-153:14, 209:11-209:23.



Video 2 at 00:25.

33.  Phillips felt this behavior was mocking Native American culture and himself. Phillips Decl. ¶ 20.  The few others who had initially started singing with him and then followed him to the students also viewed that conduct as mocking and disparaging.  Frejo Decl. ¶ 15; Andrade Decl. ¶ 12; Bell Decl. ¶ 14; *see also* Stegenga Decl. ¶ 10.  That view was not limited to them; another CovCath student also was troubled by it.  Brockett Decl. Ex. A at 9:53-10:56; Ex.

A at 4 ("I heard, we were going when Nathan Phillips came up, started doing the tomahawk thing at 'em, which some people could see as offensive. And I didn't think it was a good idea to, you know, do that one in particular directly at a Native American.").

34.     And while Sandmann maintains that video showing him raising and lowering his arm while others were doing that was not a tomahawk chop (he testified "I think I had raised my hand up to point at something"), he disagrees that such behavior was mocking, and even opines that "you could argue that people are doing it to . . . support Native Americans."  S.D. 152:13-155:17, 209:21-212:22.  But he acknowledges others see it differently and that Phillips could have perceived the chop and other behavior to be mocking him.  S.D. 157:19-158:7, 210:8-212:14 ("I never claimed that he felt like we weren't mocking him.  I mean, he's entitled to feel however he wants to.  What I'm saying is that I -- from my perception, it didn't seem like anyone ever was mocking him.").

35.     When Phillips first approached, the students were standing in a sort of half-circle to his left and in front of him, so the area to his right and rear were largely empty:



Video 5 at 04:22.  But over the course of the next minute or so, CovCath students and other onlookers filled in the areas around Phillips and the few others who had initially joined him to sing

the AIM song.  Phillips Decl. ¶ 21; Bell Decl. ¶ 14; Video 10 at 00:00-00:05.  This screenshot is

taken from video showing the crowd about 25 seconds before Phillips' encounter with Sandmann:



Video 10 at 00:02; *see also id.* at 00:26-00:27; S.D. 162:15-167:15 (acknowledging "a bunch of

people that are behind" Phillips); S.D. 214:13-19 ("Q: [] I mean, it's just a matter of opinion, right?

Somebody could perceive that there are students now who have sort of swarmed around Phillips

on both sides, right? A:  Yeah. I mean, someone could look at it that way if they wanted to.").

**G.   Phillips Tries to Exit and CovCath Students Move Aside to Let Him Pass, But Sandmann Decides to Send Phillips a Message by Standing in His Way**

36.     Given the behavior and positioning of the crowd, Phillips became concerned for

himself and the safety of the few people who had first started singing with him.  So he decided to

try to exit the situation.  Phillips Decl. ¶ 21.  He started looking around and moving towards his

right, but he perceived there were people all around him.  *Id.*; Video 2 at 00:10-00:23; Video 10 at

00:00-00:11.  Phillips did not know why people were there, nor who they were, and he did not see

any way out that way.  Phillips Decl. ¶ 21.  Phillips decided to try to exit the crowd by walking up

towards the Lincoln Memorial and finishing his song there.  *Id.* ¶ 22.

37.     When Phillips began to walk forward, there were multiple rows of students standing between where he and Sandmann were, as can be seen on several videos (Phillips and Sandmann are identified by the yellow circles):





Video 10 at 00:12; Video 17 at 02:29; *see* S.D. 160:17-161:6 ("Q: …And so at that point, there are several rows of students between you and where Mr. Phillips is, right?  A: Correct.").  As Phillips began inching forward, student after student moved to the side and out of Phillips' way, and he started walking forward towards the Lincoln Memorial.  Phillips Decl. ¶ 22; Video 10 at 0:12-26; S.D. 161:7-24 ("Q: And in this video [Video 10 at 0:12-0:26], the direction he's moving in is towards the Lincoln Memorial, right? A: Right."); *see* Video 2 at 00:32-00:44; S.D. 215:5-215:21 ("Q. So in those 12 seconds, those several rows of students who were in front of you before have parted for Mr. Phillips, right? A: Right."), 218:12-218:15; Video 8 at 00:00-00:15; S.D.

228:24-229:5;  Video 17 at 3:00-3:12, 3:29-3:42.   Earlier that day, chaperones instructed the CovCath students that if anyone approached their group, they should "walk away."  S.D. 39:5-9. As a result, for about 15 seconds Phillips was making progress in exiting the crowd.  Video 10 at 00:12-00:26.

38.     Sandmann saw that students in front of him were moving out of Phillips' way and that Phillips was walking forward through the path they created for him.  S.D. 158:8-159:1 & Ex. D (S.D. Ex. 5) at 13:06-13:56 ("Q: …So you knew that some of the other students were parting? A: That's correct. Q: They were moving out of Phillips' way? A: Yes. Q: To allow a path for him? Okay. And you saw that Phillips was starting to walk through your group? A: Yes. Q: All right. He was going forward, right? A: Right.");  S.D. 161:7-24.   However, Sandmann believed that Phillips was trying to intimidate CovCath students by walking through the crowd.  S.D. 167:16-170:1.  He acknowledges this was his subjective interpretation of Phillips' intentions.  S.D. 175:22-176:6 ("Q.  … It's your -- your interpretation of what you observed, right, at that moment, was that Mr. Phillips was trying to intimidate you, right? A. Right.  Do you know for a fact whether that is true? A. No.  Q. Possibly, you just perceived it? A. I mean, I guess.").

39.     So Sandmann decided that he was not going to follow his classmates and move to the side when Phillips approached.  Instead, he was going to "stand up for the school" by standing in Phillips' way.  Sandmann thought that would send Phillips a message that CovCath students could not be intimidated.  As Sandmann explained in texts the next day with a friend:

> Friend:  Can i ask what made you stand in front of the indian guy[?]
>
> Sandmann:  yeah[.] the whole thing with the black people calling us things and the guy moving through the crowd trying to intimidate us[.]  it just made me want to stand up for the school[.]

S.D. 167:19-169:11 & Ex. E (S.D. Ex. 10) at 1-2.

40.     Sandmann said the same thing in direct messages on Twitter he sent to Kyle Kashuv and Charlie Kirk, two prominent young conservatives, while riding the bus back to Kentucky:  "[m]embers of an indigenous people's march approached me (I was wearing a maga hat).  The man played his drum in my face but unlike others at my school i didn't step out of the way because he was trying to intimidate us."  S.D. 178:13-181:4 & Exs. F-G (S.D. Exs. 11-12) ("Q:  So again, you were -- you were aware that others -- other students were stepping out of Phillips' way? A. Right. Q:  But you didn't because you thought he was trying to intimidate you collectively? A. Yes, me and other students at the school.").  At his deposition, Sandmann elaborated:

> Q:  . . . And how did you think that standing in front of Mr. Phillips was standing up for the school?
>
> A:  Because we -- the students of the school had stood there long enough and taken all kinds of insults from the Hebrew Israelites, then had had the Native American -- or Mr. Phillips, the Native American, walk through us or whatever. And by the time he got in my face, when he could have kept -- he could have even kept going through the students if he wanted to, I figured it was time for someone to plant their foot and stand there where I had been and just face up. And to me, that was standing up for the school, because I wasn't going to move.
>
> Q. And what message was being communicated by standing up for the school? What does that mean?
>
> A. Well, it means that we can come to Washington, DC and protest something that we believe to be deeply wrong and not be harassed on our way out.
>
>                * * *
>
> Q:  Your text also said: The whole thing with the black people calling us things.  How did the black people calling us things relate to your deciding to stand in front of Mr. Phillips?
>
> A. Well, as I mentioned – [objection].  As I mentioned, we -- we had already taken many insults from them. And at one point, I just felt like enough is enough, we don't need to respond to them

anymore with chants: Someone's just got to stand here, be still and
put their foot down.

S.D. 174:25-175:21; 176:7-20 & Ex. E (S.D. Ex. 10).

41.     Videos show that "plant[ing] [his] foot and stand[ing] there" in front of Phillips is
exactly what Sandmann did.  As the other students in front of Sandmann were moving out of
Phillips' way, Sandmann moved over to his left, set his feet, and was "right in front of Nathan
Phillips" when Phillips approached.  S.D. 248:6-8; *see also* S.D. 245:23-247:22; Video 17 at
03:37-03:42 (looking down to adjust his footing as he moved):

  

Sandmann does not dispute that he moved over to his left just as Phillips was approaching that
spot, or that someone who was watching at the time could have noticed that.  He merely quibbles
about exactly what distance he moved.  S.D. 245:22-248:8 ("Q: …Can you say that it's absolutely
not noticeable to somebody who was watching this at the time? A:  No.  I'm -- I'm just saying that
the movement which I did was minimal.  It's not like I slid over a foot or two.  I moved six inches
at the most . . . Q:  So at this point, you are right in front of Nathan Phillips, right? A: Right.").[5]

**H.     Phillips Perceives that Sandmann Blocked Him**

42.     When Phillips first reached the spot where Sandmann planted himself, he did not
remain there.  Rather, Phillips turned to his left towards the student next to Sandmann (also

---

[5]  Sandmann also acknowledges that moments earlier, as Phillips was moving through the crowd, Sandmann
also "may have" moved to his right, as other students were moving out of the way.  S.D. 242:13-243:23;
Video 17 at 03:07-03:12; *see also* S.D. 206:19–208:7; Video 2 at 00:07-00:10.

wearing a red hat in the screenshots below), and that student moved over a little to his side. Video 8 at 00:15-00:21; Phillips Decl. ¶ 23; S.D. 229:16-232:6; 236:24-237:10 (Q: So we have established that initially you and Phillips came face to face? A: Right. Q: And Phillips turns to his left? A: Right. Q: He is looking at Cameron [the student next to Sandmann]? A: Right. Q: Right?  And Cameron moves-- A: Right. Q: -- to the right?  And then Phillips turns back towards you, right?  A: Right.").  But when Phillips turned back to look forward, Sandmann still did not move to make room for him to pass.  Video 8 at 00:17-00:20; S.D. 230:21-231:7; 236:24-237:10. These screenshots show Phillips' movements, starting at the point (in the first two screenshots) where Sandmann moved to his own left just as Phillips was approaching (Sandmann is identified by yellow circles):



1



2



3



4

Video 8 at 00:14, 00:16; 00:19; 00:21. Sandmann admits that it is "possible" Phillips was trying to see if both Sandmann and the student next to him would move out of Phillips' way.  S.D. 232:11-

23

14; Phillips Decl. ¶ 23.  Several rows of students standing behind Sandmann also started moving to the side, but Sandmann stood his ground.  Video 2 at 00:44-01:05; S.D. 218:16-18; 221:21-24; 232:11-18.

43.     From Phillips' perspective, he had been moving forward towards the Lincoln Memorial as the students in front of him were moving to the side and out of his way.  As he was walking forward, Phillips saw that a teenager (Sandmann) appeared to position himself to be directly in front of him, stood in his way, and did not move.  It appeared to Phillips that Sandmann did that intentionally to prevent him from continuing to walk forward.  Phillips felt surrounded in that space and perceived that Sandmann did not want to let him pass.  Phillips Decl. ¶¶ 22-26.

44.     Once he perceived that Sandmann was not moving, Phillips locked eyes with him.  S.D. 262:21-263:4; 265:7-14; 269:9-18.  Phillips felt that he and Sandmann were at an impasse, so he stood in place and continued to pray.  Phillips Decl. ¶ 26.  Sandmann also felt the two were at an impasse from his vantage-point.  S.D. 263:7-10 ("Q. Did you feel like the two of you were at an impasse? . . .  A. In some form of it, yes.").  Frejo, Bell, Andrade, and Stegenga also perceived that Sandmann blocked Phillips.  Frejo Decl. ¶¶ 17-18; Bell Decl. ¶¶ 15-16; Andrade Decl. ¶ 13; *see also* Stegenga Decl. ¶¶ 11-12.[6]

45.     Frejo became concerned that Sandmann's conduct signaled some hostile intent towards Phillips.  Even before Phillips encountered Sandmann, the behavior of many of the students had caused Frejo to become concerned for Phillips' safety, and he saw it as his duty to

_____

[6] Although Sandmann was 16 years old and Phillips was in his mid-sixties, when Sandmann stood there, he perceived Phillips to be like a child and himself to be like an adult.  In a text exchange with a friend the next day, Sandmann agreed that he was "acting like the adult and he [Phillips] was the kid," because Sandmann thought Phillips "was trying to intimidate young kids."  S.D. 188:11-19 & Ex. H (S.D. Ex. 13).  Sandmann also later wrote his principal that he thought he was being "a bigger person" than Phillips.  S.D. 275:7-14 & Ex. I (S.D. Ex. 19).  To this day, Sandmann believes that Phillips' behavior was "childish" while his own was "very mature."  S.D. 188:6-189:19.

protect an elder.  Frejo Decl. ¶ 15.  Up to that point, Frejo had been standing behind Phillips, as shown in the screenshot below (the person wearing the white cap is Frejo):



Video 16 at 00:24.  But when it appeared to Frejo that Sandmann was blocking and smirking at Phillips, he feared that Sandmann or someone else in the crowd might be intending to provoke some kind of confrontation that could result in Phillips getting hurt.  So Frejo responded to Sandmann's conduct by moving next to Phillips on his right side, to place himself as a physical buffer between Phillips and the crowd to try to protect Phillips (as shown in the screenshots below).  Frejo Decl. ¶ 19; Video 2 at 01:20-01:25; Video 16 at 00:25-00:39.




46.     Sandmann does not dispute that, based on observing Sandmann's behavior, Phillips could have perceived that Sandmann was intentionally blocking him:

Q:  Now, those -- the other students -- other students, right, parted for Phillips, correct, and you didn't?

A:  Hut-uhn.

Q.  Couldn't Phillips have perceived that you intended to stop his path forward?

25

. . .

A.  He could have. I think he would have figured out really quickly, if he tried to move anywhere else, that I wasn't going to follow them.

Q.  So you think you could have -- you think he could have figured that out, and we will talk about that, but would you acknowledge that he could have perceived that it was your intention to stop his path forward?

A.  Right.

S.D. 198:24-199:16; *see also* S.D. 269:9-18; 279:3-20.

47.     Sandmann also acknowledges that there could be significant cultural differences in

how Phillips and he perceived Sandmann's conduct:

Q:  [E]ven if a teenager thinks that an older person might be trying to intimidate them, you see that that person is walking forward and other people are parting for him, isn't the respectful thing to do to move out of his way as well?

A.  Not if he's trying to intimidate me.

Q.  …[E]ven if you think the older person is trying to intimidate you, you don't think the respectful thing to do is to just move out of the way?

A.  I can't see why I would.  If -- if they want to intimidate me, which I would assume then means they exhibit a dislike of me, I can't find any compelling reason as to why I would equally return the respect to clear a place for them to move.

Q.  Do you think people could disagree with you about that?

A.  They could.

Q.  Do you have any idea what in the Native American culture would be considered the respectful thing to do in that situation?

A.  I would assume the respectful thing is probably to just move out of the way regardless.

Q.  But you disagree with that?

A. Well, it's not how I was raised.

S.D. 193:25-195:2.

## I.     Phillips and Sandmann Stand Face-to-Face For About Six Minutes

48.     After Sandmann planted himself in Phillips' way, the two remained in place for approximately six minutes.  S.D. 346:24-347:8.  Phillips continued to drum and sing the AIM song. Phillips Decl. ¶ 26; Video 8 at 00:27-00:33.  As he did, voices from the crowd shouted taunts at Phillips like "you can't move him!"  (Video 17 at 04:38-04:43; Video 2 at 03:20-03:32; S.D. 253:1-254:2; 319:11-25), "he ain't moving!"  (Video 2 at 01:18-01:22; S.D. 311:6-312:5), and "unmovable object!" (Video 2 at 01:22-01:29; S.D. 312:6-21).

49.     While Sandmann had intentionally planted himself in Phillips' path, after a couple of minutes had gone by, Sandmann too started to feel like he wanted to exit the situation.  S.D. 184:25-185:12; 258:23-259:10.  By that point, however, the students behind Sandmann who had moved to the side when Phillips first approached had moved back over to fill in the space behind and around Sandmann.  Video 17 at 04:46-05:00; S.D. 258:9-259:10; *see also* Video 2 at 1:45-2:00.  Likewise, even more students and onlookers joined the crowd that was behind Phillips:



Video 2 at 03:42, *id.* at 3:36-3:42; S.D. 324:15-325:18.

50.     By that point Sandmann felt "I didn't have the option" to leave because he perceived he was "surrounded" by his classmates, and he also worried he might fall because he

says the steps were icy.  At that point, he too felt like he was blocked.  S.D. 184:11-185:12; 258:23-259:10; 260:11-22; 284:7-10 ("Q: …So you said you felt like you were being, at least at one point, at some point in the encounter, right, blocked by the crowd? A. Right.").[7]  Sandmann felt that way even though he thinks his classmates would have made room for him if he had asked them to move aside.  S.D. 283:9-284:10; *see also* S.D. 221:2-3 ("I mean, there was never a point where I was unable to walk – to walk away.").

51.     During those six minutes, more CovCath students mocked Phillips.  For example, one of Sandmann's best friends shouted "Grab his d--k and twist it!" while making a twisting motion with his hands in the air, and two others standing nearby then did the same thing.  Video 2 at 00:55-01:03; Video 8 at 00:35-00:42; S.D. 299:17-303:1 & Exs. J-K (S.D. Exs. 26-27) (texts in which Sandmann's friends later joke about shouting that).  That taunt was from a viral video in which a fan at a wrestling match had yelled that to urge one wrestler to do that to the other.  S.D. 303:15-305:19.[8]  That same friend also shouted, "beat that drum!" at Phillips.  Video 2 at 01:29-01:51; S.D. 312:22-315:18.  Someone else shouted, "get him!"  Video 17 at 04:43-04:46; S.D. 256:11-257:19.  Sandmann does not dispute that those statements could be perceived as mocking Phillips.  S.D. 305:8-19; 315:6-15.

52.     Shortly before the impasse ended, Andrade had a verbal altercation with the same student who had yelled "grab his d--k" and "beat that drum."  Andrade Decl. ¶ 14; Video 3 at 01:33-02:34; Video 11 at 00:12-00:59.  Andrade was frustrated because he felt students were

---

[7] A therapist who later interviewed Sandmann also noted that: "Nick recalled that he could not move, as he was being blocked by the crowd."  Ex. L (S.D. Ex. 21).  Sandmann now claims that he can't recall specifically using the word "blocked" with that therapist, but confirmed that "I relayed to the doctors that, especially when the students filled back in, [] that I had Nathan Phillips in front of me and I had students all around me and I was at the center of it and I couldn't -- I couldn't have moved to the side for Nathan Phillips at that point, really, even if I wanted to. I was stuck in the middle."  S.D. 284:11-287:8.

[8] *See, e.g.,* "Grab His D--k and Twist It," YouTube (Nov. 22, 2018), https://www.youtube.com/watch?v=on-RPW7PlYI.

continuing to taunt and jeer at Phillips.  Andrade Decl. ¶ 14.  Nonetheless, Frejo did not think that engaging with the student was a good way to handle the situation and urged Andrade, whom Frejo did not know, to back off.  Video 3 at 02:02; Frejo Decl. ¶ 20.  Sandmann did the same thing with his friend.  S.D. 336:14-25.  Phillips also thought to himself that he wished Andrade would stop. Phillips Decl. ¶ 27.

**J.     The CovCath Students Disperse**

53.     After about six minutes, a teacher came and told students the buses were arriving. Video 3 at 2:20-2:37; S.D. 346:18-347:11; *see also* Video 11 at 0:58-1:02.  Sandmann and other students then walked away.  Video 11 at 01:02-01:13.  Since the teenagers were leaving, Phillips no longer felt any need to exit and turned around to continue his prayer.  Phillips Decl. ¶ 28.

54.     Frejo knew he would eventually need to leave because he was performing at a concert, but was concerned that Phillips not be left alone.  When Frejo let Phillips know he was leaving, Andrade told Frejo "don't worry about it, we're here" and "I got him" (referring to Phillips) to assure Frejo that he would remain with Phillips.  Frejo Decl. ¶ 22; Andrade Decl. ¶ 16. When Frejo then specifically asked Andrade, "you got him?", referring to Phillips, Bell chimed in, "We got Nate, we got Nate," to reassure Frejo that she would also stay with Phillips, and Andrade reiterated, "I got him, man, we're not alone."  Frejo Decl. ¶ 22; Andrade Decl. ¶ 16; Bell Decl. ¶ 18; Video 3 at 02:43-02:55; Video 11 at 01:23-01:33.

55.     About 30 seconds after that, Andrade called out to Phillips, "we won Grandpa, we f--ing won, Grandpa."  Video 3 at 03:21-03:24.  Andrade called Phillips "Grandpa" because a familial term can be a way to express respect and endearment to elders in many indigenous (and other) cultures.  Andrade Decl. ¶ 17; Phillips ¶ 29.  He said "we won" because he felt that Phillips had succeeded in getting the students to disperse peacefully.  Andrade Decl. ¶ 17.  When Andrade said that, several onlookers cheered, though Frejo, Tee, and Phillips did not.  Video 3 at 03:20-

03:34.  Phillips did not know what Andrade meant, but Phillips did not personally think of the situation as producing winners or losers.  Phillips Decl. ¶ 29; *see also* Frejo Decl. ¶ 23.

56.    Phillips felt it was time to end the prayer, so he held the drum up and played a faster beat while rotating 360 degrees, which was a form of ritual to end a prayer by sending it in all directions.  Phillips Decl. ¶ 30; Video 3 at 3:21-3:33.  Tee, who had been watching from afar, rejoined Frejo after the students dispersed.  Frejo, Bell, and Tee all felt that Phillips' music had succeeded in bringing healing to a dangerous situation.  Frejo Decl. ¶ 24; Bell Decl. ¶ 20; Tee Decl. ¶ 14.

57.    As Phillips walked away, he held his arms up and called out "Relatives, Relatives" and then "Let's make America great, let's do that."  Video 6 at 00:00-00:30.  Phillips was trying to address everyone in the area, especially the students.  In his culture, "relatives" can be used to get the attention of a large group of people.  Phillips Decl. ¶ 31.  Phillips then walked away.  Before he left the Mall, a few people with cameras who Phillips did not know approached him and asked Phillips to comment on what had just happened, which he did.  *Id.* ¶ 32.

## STANDARD OF REVIEW

At summary judgment, the moving party has the initial burden to demonstrate the absence of genuine dispute as to any material fact.  *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009).  Once that burden is met, the non-moving party must produce "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999).  The mere existence of some alleged factual dispute is irrelevant unless it "might affect the outcome of the suit under the governing law."  *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A disputed issue is "genuine" only if a sufficient evidentiary basis exists on which a reasonable jury could find for the non-moving party.  *Anderson*, 477 U.S. at 248.  Such

evidence must be admissible at trial, *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009), and if the evidence is so "one-sided that one party must prevail as a matter of law," then that party must be awarded summary judgment.  *Roeder v. Am. Postal Workers Union, AFL-CIO*, 180 F.3d 733, 737 (6th Cir. 1999).

In defamation cases involving matters of public concern, the Kentucky Supreme Court has emphasized "the importance of summary judgment in litigation involving First Amendment issues.  Courts should take precautions to avoid the chilling effect on free speech that defamation lawsuits create."  *Welch v. American Publ'g Co. of Kentucky*, 3 S.W.3d 724, 729 (Ky. 1999).  The Court explained:

> Courts should resolve free speech litigation more expeditiously whenever possible. The perpetuation of meritless actions, with their attendant costs, chills the exercise of press freedom. To avoid this, trial courts should not hesitate to use summary judgment procedures where appropriate to bring such actions to a speedy end.

*Id.* (quoting *Maressa v. New Jersey Monthly,* 445 A.2d 376, 387 (N.J. 1982)).

## ARGUMENT

## I.   THE BLOCKING STATEMENTS ARE PROTECTED OPINION.

As this Court has recognized, statements of opinion receive distinct protection under both Kentucky defamation law and the First Amendment.  *Post*, 401 F. Supp. 3d at 791-92; *Lassiter v. Lassiter*, 456 F. Supp. 2d 876, 881-82 (E.D. Ky. 2006), *aff'd*, 280 Fed. App'x 503 (6th Cir. 2008) (citation omitted).  Whether a statement is protected as opinion is a question of law for the Court. *Cromity v. Meiners*, 494 S.W.3d 499, 504 (Ky. 2015).  Statements are actionable only if they "make[] an assertion of fact–that is, an assertion that is capable of being proved objectively incorrect," *Clark v. Viacom Int'l, Inc.*, 617 F. App'x 495, 508 (6th Cir. 2015) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)), or otherwise "connote[] actual, objectively verifiable facts."  *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007).  But

where a statement is of an "inherently subjective nature," it constitutes protected opinion. *Id.*; *Blessing v. Cable News Network, Inc.*, No. 220CV0015 (WOB-CJS), 2020 WL 7647530, at *6 (E.D. Ky. Dec. 23, 2020) (quoting *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 598-601 (6th Cir. 2013)) (terms conveying "inherently subjective" concepts are protected opinion). Additionally, where the factual bases for a statement are disclosed, the "reader is in as good a position" as the speaker to "judge" whether the conclusion reached was in fact correct. *Lassiter*, 456 F. Supp. 2d at 882 (defendant's conclusion that plaintiff had committed adultery "on the basis of [disclosed] rumor and circumstantial evidence which was persuasive to her" was opinion); *Loftus v. Nazari*, 21 F. Supp. 3d 849, 853 (E.D. Ky. 2014).

## A.     The Blocking Statements Reflected Phillips' Subjective Perspective.

Phillips' impression that he was "blocked" by Sandmann and could not "retreat" was based on his own "subjective assessment" of the circumstances resulting in the confrontation with Sandmann, including Sandmann's intentions and conduct. *Croce v. Sanders*, 843 F. App'x 710, 715 (6th Cir. 2021). It is well-established that such a presentation of one's point of view, including the perception of another's motivations, is quintessentially a matter of opinion. *See, e.g.*, *id.* at 714 (a statement that "represents a point of view that is obviously subjective" is non-actionable opinion); *Underwager v. Channel 9 Austl.*, 69 F.3d 361, 367 (9th Cir. 1995) (statements concerning the plaintiff's "motivations" among others were opinion); *Catalanello v. Kramer*, 18 F. Supp. 3d 504, 518 (S.D.N.Y. 2014) (language regarding "motivations underlying [an individual's] alleged actions" is opinion).

Here, Phillips confirms that he perceived Sandmann to be blocking him, and multiple other persons who were looking at the situation from a similar vantage point perceived it the same way. *See Statement of Facts* ("SF") ¶¶ 43-44. In fact, when Frejo perceived Sandmann to be blocking Phillips, he grew so concerned for Phillips' safety that he moved closer to Phillips to physically

protect him.  SF ¶ 45.  And in Sandmann's first public statement two days after the incident, he said "I never *felt* like I was blocking the Native American protestor," which underscores that the situation was a matter of perspective.  Ex. M (S.D. Ex. 20) at 2 (emphasis added).  Moreover, at his deposition Sandmann reiterated that although he did not "feel" like he was blocking Phillips, he recognized that Phillips "could have" perceived that Sandmann "intended to stop [Phillips'] path forward."  SF ¶ 46.  Thus, the record warrants granting summary judgment to each Defendant on that basis alone.

The inherent subjectivity of Phillips' statement is further illustrated by Sandmann's explanation that a few minutes into the standoff, he began to perceive that the rest of the crowd, including Phillips, was *blocking him.*  SF ¶¶ 49-50; S.D. 284:7-10 ("Q: …So you said you felt like you were being, at least at one point, at some point in the encounter, right, blocked by the crowd? A. Right.").  A therapist who interviewed Sandmann recorded that:  "Nick recalled that he could not move, as he was being blocked by the crowd."  Ex. L (S.D. Ex. 21).  And Sandmann felt blocked (or, as he also put it, "stuck") even though he believed his classmates would have made room for him if he had asked them to move aside.  SF ¶ 50.  Someone else watching the same events might disagree that Sandmann was being blocked by his friends and classmates, but that only further highlights how feeling "blocked" in those moments was a matter of subjective impression, not a provable fact.  Indeed, much of what occurred throughout that afternoon was viewed very differently by different people who were watching the same thing.[9]

---

[9]      For example, to Sandmann the BHI's behavior was a "culture shock," while some others there were familiar with obnoxious street protestors.  *Compare* S.D. 51:4-52:9, *with* Andrade Decl. ¶ 5; Tee Decl. ¶ 6.  And while the students outnumbered the BHI by perhaps 30-1, Sandmann "*felt* threatened" by the BHI and felt they "outmatched" the students.  S.D. 80:11; 99:21-100:12.  By contrast, others perceived the students to be a threat to the BHI.  Phillips Decl. ¶¶ 8-11; Frejo Decl. ¶¶ 8-10; Andrade Decl. ¶¶ 6-7; Bell Decl. ¶¶ 8-10.  Sandmann saw what the students were doing to be "common or recognizable" school cheers, S.D. 95:21-22, while to others their conduct appeared to be mob-like aggression.  Phillips Decl. ¶ 10; Bell Decl. ¶ 9.  Sandmann saw rolling a water bottle towards the BHI while shouting "Trump water, Trump water" to

**B.      Phillips' Perception Was Supported By Disclosed Facts.**

Additionally, in its initial opinion in the *Post* case, this Court noted facts disclosed by Phillips to support his perception.  *Post,* 401 F. Supp. 3d at 793.  Discovery has reinforced that conclusion.

Phillips said that he was trying to exit the crowd by going up to the Lincoln Memorial. There is no evidence in the record to create any genuine dispute of fact about that.  *See* Phillips Decl. ¶ 22.  To the contrary, the videos show, and Sandmann acknowledges, that roughly fifteen seconds before he encountered Sandmann, Phillips started moving in the direction of the Memorial.  Video 10 at 00:12-00:26; S.D. 158:25-159:1; 161:7-24.  Nor is there any question that when Phillips reached where Sandmann was, Sandmann stood in front of him.  SF ¶¶ 37-41. Moreover, there is no genuine dispute about the other disclosed facts supporting Phillips' perception, which the Court noted in its initial decision, like the size of the crowd, the tense atmosphere, and taunts directed at Phillips.  *Post,* 401 F. Supp. 3d at 793.

With respect to the crowd, videos confirm that the students vastly outnumbered Phillips, *e.g.*, Video 10 at 00:00-00:10; Video 3 at 04:08-05:15, and the day after the incident Sandmann

---

be just "all boys school humor," S.D. 112:5-113:6, while others saw such chants to be deliberately provocative.  Phillips Decl. ¶¶ 7-9; Frejo Decl. ¶ 9; Bell Decl. ¶ 9.

Once Phillips approached, what he was singing as a prayer to try to calm the students down was perceived by some of the students, including at least initially Sandmann, to be an invitation to be even more boisterous.  S.D. 141:4-10.  And Sandmann decided to stand his ground because he "*felt*" and "*perceive[d]*" that by moving forward through the crowd Phillips was "trying to intimidate" the students.  Sandmann also "assum[ed]" those who followed Phillips "knew each other".  S.D. 51:4-52:9; 80:11-14; 169:19-170:10; 173:4-174:19; 192:17-193:2; 195:1-2; 200:11-14; 338:2-10 & Exs. D, H (S.D. Exs. 5, 13) (emphases added).  Phillips, on the other hand, was trying to exit the crowd because he felt intimidated by the students. Phillips Decl. ¶ 21.  Finally, in Sandmann's opinion there was nothing wrong with a 16-year-old intentionally standing in the way of an elderly man to try to counter perceived "intimidation," and both then and now he perceives himself to have been "the bigger person" and Phillips to have been behaving like a child.  S.D. 275:7-14; 295:21-296:2 & Ex. I (S.D. Ex. 19).  By contrast, others perceived Sandmann's conduct and affect to be disrespectful and self-righteous.  Bell Decl. ¶ 15; Frejo Decl. ¶ 18.

wrote to his principal that as the standoff wore on, Sandmann himself came to feel that he was surrounded by "250-ish students."  S.D. 260:11-22 & Ex. I (S.D. Ex. 19).  Even assuming that number may not be precise, *id.,* whatever the exact number may be stands in stark contrast with Phillips.  *See also* S.D. 97:14-98:5 (there were "over a hundred of us").  When Phillips first began to sing, as he was standing off to the side, there were less than a handful of other people who either suggested he sing or indicated to him they too would sing.  Phillips only knew one of them, Ashley Bell.  Phillips Decl. ¶ 33; Frejo Decl. ¶ 14; Bell Decl. ¶ 4; Andrade Decl. ¶ 8.  Once Phillips started approaching the students, and then throughout the encounter, others gathered behind Phillips.  By the time Phillips was within the crowd and began moving towards the Lincoln Memorial, there were "a bunch of people behind" him, as well as students on all sides of him.  Phillips did not know who those people were, and as time passed the crowd surrounding him only grew larger.  S.D. 162:15-167:15; Phillips Decl. ¶ 21.

As for the tense atmosphere, Sandmann himself describes the atmosphere when Phillips first approached the students as "confus[ing]" to both himself and (he perceived) "most of the people" there.  S.D. 140:12-141:17.  Videos confirm that as soon as Phillips approached, many students in front of and around Phillips were calling out loudly and jumping up and down, *e.g.*, Video 4 at 1:12:48-1:13:02; Video 5 at 04:28-04:38; Video 17 at 01:59-02:13, and at one point two different people – a student standing near Phillips and then a member of the BHI – even shouted out "don't touch him!" (the student) and "y'all better not touch him!" (the BHI).  Video 4 at 1:13:02-1:13:22; Video 5 at 4:18-4:55; S.D. 134:25-139:11; 145:16-147:7.  Sandmann himself is not certain who was calling out to whom, because "[o]bviously, I believe the Black Hebrew Israelites and the student are looking at the situation from two different perspectives."  S.D.

146:12-14.  Phillips also perceived that students were swarming around him, a perception which Sandmann acknowledges is a "matter of opinion."  Phillips Decl. ¶ 21; S.D. 214:13-19.

And with respect to taunts directed at his group, Phillips confirms that he perceived the tomahawk chops, chants, and behavior of some students to be mocking both him and Native American culture.  SF ¶¶ 32-33.  Others felt the same way, including at least one CovCath student.  SF ¶ 33.  And while Sandmann thinks there was nothing wrong with that behavior, he does not dispute that Phillips could see it differently.  SF ¶ 34.  Indeed, Sandmann also felt, from his point of view, that he and Phillips were "at an impasse."  S.D. 263:7-10.  Thus, the Blocking Statements are protected opinion based on disclosed facts.  *See Macineirghe v. County of Suffolk*, No. 13-cv-1512 (ADS)(SIL), 2015 WL 4459456 (E.D.N.Y. July 21, 2015) (statement that a plaintiff "blocked" a police vehicle was an opinion based on disclosed facts).

In short, the record confirms this Court's initial conclusion that "[h]ow Phillips 'felt' is obviously subjective," and whether Phillips felt that he was "'blocked' is simply not 'capable of being proved objectively incorrect.'"  *Post*, 401 F. Supp. 3d at 792.  *See also Croce*, 843 F. App'x at 715 ("[A]n expression of opinion based on [a] subjective assessment . . . cannot support a defamation suit.").  Summary judgment for each Defendant should therefore be granted.

### C.   Sandmann's Amended Allegations Were Baseless Speculation.

Sandmann's claims proceeded to discovery on the basis of additional allegations about Phillips' state of mind at the time of the encounter.  At the outset, Defendants note that even if they were true, which they are not, the Blocking Statements would not be actionable.  *See Milkovich*, 497 U.S. at 20 n.7 (noting that a falsely-voiced opinion may only be probative of malice, but not of falsity); *Hammer v. City of Osage Beach, MO*, 318 F.3d 832, 842 (8th Cir. 2003) ("Statements of opinion, even if made maliciously or insincerely, are afforded absolute privilege

under the free speech clause of the First Amendment and cannot be actionable libel.").  But in any event, the record shows those allegations to be nothing more than baseless speculation.

The gravamen of Plaintiff's amended theory is that Phillips was never trying to defuse anything, never felt threatened, and was not trying to exit the crowd to go to the Lincoln Memorial. Rather, Sandmann alleges that Phillips and some unidentified group of "activist companions" planned and executed a scheme to instigate and capture a confrontation on video that they could then cause to go "viral" on social media.  And after the encounter was over and Sandmann walked away, Phillips and his "companions" allegedly "celebrated" accomplishing that goal.[10]

At his deposition, Sandmann identified four faces from video whom he contends were the "companions" who allegedly planned and executed this scheme with Phillips:



Video 10 at 00:00; S.D. 341:5-345:2 (identifying "the man in the red hat" [Andrade]; "the guy with the white hat" [Frejo]; "a man with a snap[b]ack [hat] that's holding a professional camera" [Stegenga]; and a woman with "dream catcher earrings").[11]  Sandmann assumed those four individuals and Phillips all knew each other because one of them referred to Phillips as "grandpa";

---

[10] ABC Compl. ¶¶ 11, 21, 39-41, 44, 59-60, 63-66; N.Y. Times Compl. ¶¶ 8, 20, 38-40, 43, 58-59, 62-65; CBS Compl. ¶¶ 9, 21, 39-41, 44, 59-60, 63-66; Rolling Stone Compl. ¶¶ 10, 20, 38-40, 58-59, 62-65; Gannett Compl. ¶¶ 25-27; 30, 45-46, 49-52.

[11] The unidentified woman with "dream catcher earrings" can be seen in other videos.  *See, e.g.*, Video 6 at 00:47; Video 11 at 01:03-01:05; S.D 342:15-343:1.

someone else at some point also referred to Phillips as "elder"; and Sandmann also assumed that Phillips helped organize and lead the March so they must have all known one another from that event.  S.D. 343:14-344:2.  Sandmann also identified the man wearing a red hat who is holding a camera in the screenshot above as the "cameraman" (the middle yellow circle above), who Sandmann alleges Phillips "brought with him" to help execute this supposed scheme.  S.D. 200:4-202:3 & Ex. D (S.D. Ex. 5) at 13:06-13:56.

But Sandmann is, in a word, wrong, and his conspiracy theory is baseless.[12]  Phillips was not involved in organizing or leading the March.  Phillips Decl. ¶ 2.  The alleged "companions" did not even know one another when Phillips approached the students, much less hatched a plot to capture some viral moment.  Phillips Decl. ¶ 33; Andrade Decl. ¶ 19; Frejo Decl. ¶ 25; Stegenga Decl. ¶ 16.  One was actually a journalist.  Stegenga Decl. ¶¶ 2, 16.  The individual (Andrade) who called Phillips "grandpa" did not know Phillips but called him that because familial terms may be used as a respectful way to address an elder person in some indigenous cultures.  Andrade Decl. ¶¶ 8, 17; Phillips Decl. ¶ 29.  People considered Phillips an "elder" because he was obviously older than they were.  Frejo Decl. ¶¶ 12-13; Andrade Decl. ¶¶ 8, 11, 17.

As for the incident itself, it was impromptu and spontaneous.  Different people, for different reasons of their own, happened to be standing in the Memorial area after the March and were

---

[12] *See* Phillips Decl. ¶ 33 ("Going in front of the teenagers to try to accomplish that was a spur of the moment decision.  Nothing I did from that point until the crowd of teenagers broke up was planned.  It was all in response to how I perceived the teenagers in the crowd responding to me including, once he stood in front of me, Mr. Sandmann."); Frejo Decl. ¶ 25 (Sandmann's accusations that Phillips' "drumming, singing and approaching the students was some kind of conspiracy to manufacture a viral moment" is "just false."); Bell Decl. ¶ 22 ("I am stunned that Mr. Sandmann and his lawyers have since claimed that Mr. Phillips' approach was a premeditated publicity stunt, planned with other supposed 'companions' to create some kind of viral moment.  To the contrary, to my knowledge it was a spur of the moment response to try to help diffuse a heated situation."); Andrade Decl. ¶ 19 ("false" that "Mr. Phillips and other Native Americans there got together to plan some kind of political publicity stunt to create a confrontation with the students and capture it on video"); Stegenga Decl. ¶ 16 ("not true" that Stegenga was "part of a 'group' led by Mr. Phillips that planned some kind of publicity stunt").

watching the back-and-forth between the students and the BHI.  SF ¶¶ 19-22, 29-30.  Each of them perceived it to be a potentially dangerous and escalating confrontation, as did others who were watching the same thing, including one of Sandmann's peers.  *Id.* & SF ¶ 17.  Even so, exactly how each person perceived the situation, and why each of them drew that conclusion, varied.[13]

As the situation seemed to escalate, Phillips voiced concern about what was happening between the students and the BHI.  Phillips Decl. ¶ 12.  Andrade was standing nearby and suggested that Phillips sing to try and defuse the situation.  Andrade Decl. ¶ 8.  Tee was also nearby and gave Phillips a drum to use.  Tee Decl. ¶ 10.  Frejo was standing some distance away but saw Phillips drumming and felt a responsibility to go and be with an elder, because his culture taught him that was the responsible thing to do.  Frejo Decl. ¶¶ 11-14.  Bell was standing near Phillips and simply followed his lead as an elder.  Bell Decl. ¶ 13.  Of those people, Bell was the only one Phillips knew personally.  Phillips Decl. ¶ 12; Bell Decl. ¶ 4.

But what those individuals did have in common was a cultural and religious tradition that taught them that drumming, singing, and praying was a natural and appropriate way to try to defuse a tense situation.  Phillips Decl. ¶¶ 13-14; Tee Decl. ¶ 11; Andrade Decl. ¶¶ 8-9 ; Frejo Decl. ¶ 13; Bell Decl. ¶ 11.  So what to Sandmann seemed like a malicious attempt to intimidate the students, and to some other students may have seemed just confusing, was in the eyes of Phillips, Frejo, Andrade, and Tee a natural, positive response to a tense and dangerous situation.

Once Frejo joined Phillips in song, on the spur of the moment Phillips walked up towards the students.  Phillips Decl. ¶¶ 16-17, 33.  Phillips never told anyone he was going to do that, asked

---

[13] For example, Phillips perceived the students' behavior as aggressive and threatening.  Phillips Decl. ¶¶ 7-10.  Tee perceived it more as misguided, youthful machismo.  Tee Decl. ¶ 9.  Frejo thought the "sumo cheer" looked like a version of the haka, a dance native to another indigenous culture.  Frejo Decl. ¶ 9.  Bell perceived that a cheer described by Sandmann as "Victory is our Battle Cry" to be racially insensitive because it involved getting down on one knee in front of the BHI, which to Bell evoked images of the Colin Kaepernick controversy.  Bell Decl. ¶ 12.

anyone to join him, or asked anyone to videotape anything. *Id.* ¶ 17; Andrade Decl. ¶¶ 10-11;  Bell Decl. ¶ 13; Frejo Decl. ¶ 14; Tee Decl. ¶ 15; Stegenga Decl. ¶ 16.  There were less than a handful of people who had started singing with Phillips before he approached the students, and they all followed of their own volition because they hold elders in high esteem and supported what they perceived to be Phillips' attempt to pacify the charged situation. *See* Andrade Decl. ¶ 11; Bell Decl. ¶ 13; Frejo Decl. ¶¶ 12-15.  As for the man who Sandmann alleges was Phillips' "cameraman," that was Andrade.  He did not know Phillips, and like many others in the area, including CovCath students, was recording video for himself with his own camera, and did not post what he filmed on social media.  Andrade Decl. ¶ 10.

Once Phillips started approaching the students, other people in the area came to stand behind him, including the (unidentified) woman with "dream catcher earrings," and as time passed, many other adults and teenagers.  But Phillips had nothing to do with the choices made by any of the scores of other people who happened to be in the one of the nation's most touristed places. Phillips Decl. ¶¶ 17, 33.  Neither did Sandmann, who (like Phillips) testified that there were many adults and teenagers he did not know who were milling around and seemed to try to place themselves within or near the CovCath students. *See, e.g.*, S.D. 139:20-140:11 (Sandmann thinks a teenager standing next to him may have been from a different school); S.D. 372:16-19 (student who said on a video that "land gets stolen, that's how it works" attended a different Kentucky school); S.D. 83:22-84:20 (person standing at the edge of the CovCath students who joked about "lynchings" likely not a CovCath student).

Finally, Sandmann premised his theory of a coordinated scheme heavily on his own speculation about the import of various words spoken by one person standing near Phillips (who was Andrade).  That speculation is likewise refuted by the record.

*First*, the Complaints allege that one of Phillips' supposed "accomplices" was "berating" a classmate, saying "you white people, go back to Europe where you came from."[14]  According to Sandmann, this showed that the "accomplice" and Phillips were behaving in similar ways and had "a common link."  S.D. 330:11-18; 338:14-339:16.  To the contrary, at that moment it was Phillips and Sandmann who reacted to that argument in at least one similar way, in that both were hoping each side of that argument would stop.

Andrade spoke those words, to the same friend of Sandmann's who just moments earlier had urged Sandmann to "Grab his d--k and twist it!" and Phillips to "beat that drum!". SF ¶¶ 51-52.  The friend engaged with Andrade and seemed to argue that Native Americans have no more claim to be indigenous than white Europeans because, he asserted, if you go back far enough in history ("let's go back to Africa"), their ancestors emigrated over a "land bridge" and stole land. Video 3 at 01:38-02:20; Video 11 at 00:12-00:56.  Far from a conspiracy to "get" Sandmann, both Phillips and Sandmann, along with Frejo, actually had one reaction to the exchange in common. Phillips wanted Andrade to stop.  Phillips Decl. ¶ 27.  Frejo actually urged Andrade to stop.  Frejo Decl. ¶ 20; Video 3 at 02:02.  And Sandmann says he did the same to his friend.  S.D. 336:20-25.

*Second*, the Complaints allege that shortly after the students dispersed, the same alleged "Phillips supporter" and "cameraman," i.e., Andrade, said several times "I got him," "I got him man."   The Complaints allege those comments indicate that Phillips and his supporters "celebrated" their victory over a student.[15]  *See also* S.D. 271:7-273:14 ("To me that means that they got their captured moment on camera and they planned to post it, which turned out to be exactly what they did.").  In fact, Andrade was not anyone's cameraman and the "him" he was

---

[14] ABC Compl. ¶ 60; N.Y. Times Compl. ¶ 59; CBS Compl. ¶ 60; Gannett Compl. ¶ 46; Rolling Stone Compl. ¶ 59.
[15] ABC Compl. ¶¶ 64-65; CBS Compl. ¶¶ 64-65; N.Y. Times Compl. ¶¶ 63-64; Rolling Stone Compl. ¶¶ 63-64; Gannett Compl. ¶¶ 50-51.

referring to was *Phillips*, not Sandmann or some other student.  Andrade, as well as Bell, was assuring Frejo that Phillips would not be left alone after Frejo left the area.  SF ¶ 54.  Sandmann also speculates that when Andrade complained to a chaperone, "we had a demonstration here, and you come here and you do this?" (Video 11 at 1:08-23), that Andrade was referring to the confrontation with the students as the "demonstration" and further implying that it was pre-planned.  This speculation likewise fails.  The "demonstration" Andrade was referring to was the March, and he was expressing to a chaperone his frustration that after what had been a peaceful event, he felt the students had caused a disruption with their behavior.  Andrade Decl. ¶ 15.

*Third*, Sandmann makes much of the same "companion" (Andrade) calling out "we won grandpa."  The Complaints allege that this was evidence that the "companion" and Phillips knew each other and that "they got their captured moment on camera and they planned to post it [.]"[16] *See also* S.D. 272:2:3.  But Andrade and Phillips did not know each other.  Andrade used "Grandpa" to respectfully address an elder, not as a reference to a relationship.  Andrade Decl. ¶ 17; Phillips Decl. ¶ 29.

Similarly, as he was walking away Phillips called out "relatives, relatives" and "let's make America great, let's do that."  Video 6 at 00:00-00:30.  Sandmann assumed Phillips said "relatives" because he was "referring to the people he's with."  S.D. 371:21-372:10.  But Phillips was simply trying to address everyone around him, especially the teenagers.  Phillips Decl. ¶ 31.  Here too, for Phillips, "relatives" was culturally a common way to get the attention of a group of people.  *Id.*; *see also* Bell Decl. ¶ 19; Frejo Decl. ¶ 23.  And Andrade explains that he said "we won" to express that Phillips had succeeded in "getting the students to stop their aggressive behavior and depart peacefully."  Andrade Decl. ¶ 17.  For his part, Phillips was not sure what Andrade meant, but it

---

[16] ABC Compl. ¶ 65; CBS Compl. ¶ 65; N.Y. Times Compl. ¶ 64; Rolling Stone Compl. ¶ 64; Gannett Compl. ¶ 51.

did not reflect how he felt because he "did not perceive the situation as producing winners or losers." Phillips Decl. ¶ 29.  Likewise, neither Frejo nor Tee responded to the statement at all. Frejo Decl. ¶ 23; Video 3 at 3:20-3:34.

*Fourth*, the Complaints allege that after Sandmann walked away and the students dispersed, Phillips did not go to the Memorial, but instead held his drum over his head and beat it loudly, while the rest of Phillips' supposed "group" cheered.  The Complaints allege Phillips was "celebrating" a successful plot to capture viral video.[17]  But what Sandmann witnessed Phillips doing was a ritual to end a prayer by symbolically sending it in all directions.  Phillips Decl. ¶ 30. And as Phillips said in the Blocking Statements, he had tried to go to the Memorial to exit from what he perceived to be an ugly situation.  Once the students dispersed, he had no need to do that. *Id*. ¶ 28.

In short, summary judgment is warranted because the Blocking Statements are protected opinion.  And while these Defendants submit that the reasons discussed herein are alone sufficient to grant summary judgment, each also separately maintains that the context in which the Blocking Statements were included within their specific articles and/or broadcasts further supports that conclusion.  Those additional arguments are addressed in the separate briefs concurrently filed by each Defendant in each of the pending cases.

## II.      THE BLOCKING STATEMENTS ARE SUBSTANTIALLY TRUE.

Even if this Court were to conclude that the Blocking Statements are statements of fact rather than opinion, summary judgment remains appropriate.  The "gist" or "sting" of the statements is that Sandmann deliberately stood in Phillips' way to obstruct his path.  The undisputed facts, including Sandmann's own testimony, show that is what occurred.  Sandmann

---

[17] ABC Compl. ¶ 66; CBS Compl. ¶ 66; N.Y. Times Compl. ¶ 65; Rolling Stone Compl. ¶ 65; Gannett Compl. ¶ 52.

therefore cannot meet his constitutional burden to demonstrate that the Blocking Statements are materially false.

**A.    The First Amendment Places the Burden on Sandmann to Show That the Blocking Statements Were Materially False.**

While state defamation law typically places the burden on the defendant to prove truth, the First Amendment requires that every defamation plaintiff has the burden of proving that speech of public concern is materially false. *Clark*, 617 Fed. App'x at 508.  Here there is no question the Defendants' publications were speech of public concern. *Post*, 401 F. Supp. 3d at 789.  And as the Sixth Circuit has noted, "[i]f the truth or falsity of public commentary cannot be determined, the First Amendment requires that the scales be "tip[ped] . . . in favor of protecting true speech." *Clark,* 617 Fed. App'x at 508 (quoting *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775-76 (1986)).  Thus, summary judgment is required where a plaintiff "fail[s] to demonstrate a genuine issue as to the material falsity of any of the alleged defamatory statements." *Bennett v. Cisco Sys., Inc.*, 63 Fed. App'x 202, 207 (6th Cir. 2003).

Importantly, a statement need not be literally true for the defendant to prevail.  Rather, defamation law looks to whether "the substance, the gist, the sting, of the libelous charge be justified." *Estepp v. Johnson Cty. Newspapers, Inc.*, 578 S.W.3d 740, 744 (Ky. App. 2019) (quoting *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991) (citation omitted)); *see also Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 312 (6th Cir. 2000) (same).  Thus, media defendants are "not to be held to the exact facts or to the most minute details of the transactions that [they] report[]." *Bell v. Courier-Journal & Louisville Times Co.,* 402 S.W.2d 84, 87 (Ky. 1966).  Courts have therefore regularly granted summary judgment to defendants on the falsity element of a defamation claim so long as the gist of allegedly defamatory statements was substantially true, even with respect to statements that (unlike here) did contain actual, factual

inaccuracies. *See, e.g., Nichols v. Moore*, 477 F.3d 396, 401 (6th Cir. 2007) (statements that individual was arrested "in connection with" the Oklahoma City bombing substantially true even though plaintiff was "never arrested or charged" for criminal acts "directly related" to the bombing, but rather charged in connection with an unrelated incident resulting from the investigation); *see also Nat'l Coll. of Kentucky, Inc. v. WAVE Holdings, LLC*, 536 S.W.3d 218 (Ky. Ct. App. 2017) (affirming summary judgment on grounds that statements at issue were true or substantially true); *Trover v. Kluger*, No. 4:05-cv-014-H, 2007 WL 528419, at *7 (W.D. Ky. Feb. 14, 2007) (record shows that plaintiff "would be unable to meet his burden" to prove that certain statements were false).

### B. Sandmann Cannot Meet His Burden of Showing a Genuine Dispute That the Blocking Statements Were Materially False.

At bottom, the gist and sting of the Blocking Statements is that a teenager deliberately stood in the way of an older man to obstruct the path he was taking. The record shows that is what happened. When Phillips started walking in the direction of the Lincoln Memorial, there were multiple rows of students between Phillips and Sandmann. Sandmann observed that Phillips was moving forward, that students were moving out of Phillips' way, and that Phillips was walking through the path they created for him. But Sandmann thought that by walking through the students, Phillips was trying to intimidate them. So he decided that "unlike others at my school" he was not going to step out of Phillips' way. SF ¶ 40. Rather, he thought it was "time for someone to plant their foot" and "face up" to Phillips because "enough is enough" and he wanted to send a message that the school would not be intimidated. *Id*. In fact, Sandmann acknowledges (as video clearly shows) that just as Phillips was approaching, Sandmann moved over a little, and once he did he was standing directly in front of Phillips and did not move from that position for about six minutes. SF ¶¶ 38-41.

Because the gist and sting of the Blocking Statements is accurate, they are substantially true regardless of whether Sandmann quibbles with Phillips' choice of the word "blocking" to express the point that Sandmann intentionally stood in his way.  *See, e.g.*, *Novotny v. Elsevier*, 291 F. App'x 698, 706 (6th Cir. 2008) (statement that plaintiff was "sacked for *fiddling* with expenses" was substantially true where the undisputed facts showed that she was "terminated for attempting to have subordinates submit expense reports so that her supervisor would not review them"); *Estepp*, 578 S.W.3d at 746 (statements in newspapers article that plaintiff was "removed from" and "relieved of" his job were substantially true where plaintiff had resigned); *Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219 (S.D.N.Y. 2015) (statement in news report that "right now I am basically holding a bomb in my hand" to refer to rifle targets used for sport was substantially true because the gist was that the targets could explode), *aff'd sub nom. Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236 (2d Cir. 2017).  *See also Taxpayers' League of Bell Cty. v. Sun Publ'g Co.*, 75 S.W.2d 564 (Ky. 1934) (affirming demurrer because defendant's statement that the plaintiff had "blocked" a county from paying its debts was not materially different than using words like "thwarted," "impeded," "hindered," or "delayed").  Summary judgment should therefore be entered for each Defendant.

In fact, although it is not necessary for the Court to address the matter any further, Defendants would be entitled to summary judgment even if the law required that the Blocking Statements be literally true (which it does not).  *See Tannerite*, 135 F. Supp. 3d at 235 (defendant need not meet the "precise definition" of a word if its use of that word is substantially true).  This Court has previously noted that "block" means "'to obstruct or close with obstacles.'"  *Post*, 401 F. Supp. 3d at 792 (quoting *Block*, Oxford English Dictionary, OED (Oxford Univ. Press 2019)).  Other definitions are materially the same.  *See Block*, Merriam-Webster Dictionary,

https://www.merriam-webster.com/dictionary/block (to "block" is "to hinder the passage, progress, or accomplishment of by or as if by interposing an obstruction").

Here, the undisputed facts shows that Sandmann did "obstruct [Phillips] with obstacles [himself]," and he did "hinder the passage [or] progress [of Phillips] . . . by interposing an obstruction [himself]." As to "retreat," that word need not literally mean to move "backward" – it also means to "withdraw" or to "reced[e] from a position or state attained," or simply to "move away from a place[.]" *See Retreat*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/retreat; *Retreat*, Oxford Learner's Dictionaries, https://www.oxfordlearnersdictionaries.com/us/definition/english/retreat_2. There are no facts to create a genuine dispute over Phillips' testimony that he was trying to "move away from a place" when Sandmann decided to stand in his way.

Indeed, Sandmann's explanation at his deposition shows that his dispute is not really with the facts, but rather with both the common-sense gist and even some dictionary definitions of the word "block." He maintained that deliberately standing in Phillips' way as he was walking forward was not "blocking" him. Rather, he testified that in order to have been "blocked": (1) Phillips would have needed to try harder to circumvent the obstacle that Sandmann posed and test any possible escape route, and (2) Sandmann would in turn have needed to respond by matching each of Phillips' movements to choke off any attempt by Phillips to leave. As Sandmann put it:

> Q. …In your opinion, what would it have looked like if you had blocked him, if you were blocking him?
>
> A. In my opinion, for me to block him, he would have had to have taken a step or a half step in another direction, other than standing there, even forward, and it would have required me to meet him in the corresponding way, wherever he went, to, you know, basically not let him go anywhere.

47

> Q. Okay. And that's your understanding or definition of blocking in this context?
>
> A. Yes.

S.D. 280:6-18.  Sandmann also points out that about 15 seconds *after* he had already planted himself in Phillips' way – and *after* Phillips had already looked to Sandmann's right, Sandmann did not move and the two had "locked eye contact" – some space to Sandmann's left opened up because other students who were standing there moved to the side, as shown in the screenshots below:



Video 2 at 00:44, 00:53; *see also id.* at 00:32-01:34; Video 8 at 00:15-00:35.  So Sandmann asserts that at that point Phillips could have tried to test him by seeing if Sandmann would allow Phillips to maneuver around him that way, and only if Sandmann had then moved again to step in his way could Phillips claim to have been "blocked."  S.D. 223:14-224:2; 232:11-234:1.

Even at first blush, this argument is rich in irony.  Sandmann insists that intentionally standing in Phillips' way was not blocking him because as time passed, he speculates that other students nearby were less inclined to follow his lead and also block Phillips.  In any event, the premise of Sandmann's testimony is that Defendants must establish the literal accuracy of an extreme and idiosyncratic definition of "blocked" that he proffers.  That is exactly the standard the substantial truth doctrine rejects.  *See Tannerite*, 135 F. Supp. 3d at 235; 864 F.3d at 248 (court need not accept as true a plaintiff's restrictive and "conclusory definitions" of the word "bomb" and instead must only consider "credible definitions"); *Hildebrant v. Meredith Corp.*, 63 F. Supp.

3d 732, 739 (E.D. Mich. 2014) (rejecting plaintiff's cramped argument that the phrase "accused of stealing during a raid" only substantially true if plaintiffs in fact stole); *Fry v. Lee*, 408 P.3d 843, 850 (Colo. Ct. App. 2013) (rejecting plaintiff's extreme and unsupported definitions of the words (1) "plagiarism" and "recant" as always entailing an intent requirement, and (2) "charge" as solely requiring a criminal indictment, all in contrast to "standard dictionary definitions"); *Harrison v. Chicago Sun-Times, Inc.*, 793 N.E.2d 760, 767 (Ill. Ct. App. 2003) (rejecting plaintiff's contention that the word "kidnapping" always referred to a narrow Illinois criminal offense as opposed to its commonly understood meaning of a "wrongful taking, or removal").

Put another way, neither defamation law nor common sense require that in order to convey the point that Sandmann deliberately stood in his way, the then 64-year-old Phillips had to behave like an NFL running back searching for some hole in the line to try to out-maneuver a teenager on a flight of icy stairs. To the contrary, the very fact that Sandmann maintains that to try to exit the situation Phillips had to stop and then try to "go around" Sandmann, or seek out some other escape route to evade him, confirms that Sandmann was deliberately "hindering the progress of" Phillips by obstructing it – i.e., blocking him even by a standard of literal truth. *See* S.D. 275:17-277:11. And it certainly establishes that the Blocking Statements are, at a minimum, *substantially* true.[18]

Finally, Sandmann's assessment of his own alleged predicament a few minutes into the confrontation further illustrates why he cannot escape summary judgment by trying to apply the literal truth of an idiosyncratic definition of "blocking" uniquely to Nathan Phillips's words. Sandmann says that several minutes into the standoff he began to have second thoughts about

---

[18] In discovery, Sandmann's counsel stated that he intends to try to meet his burden on the element of material falsity by proffering the opinion of a linguistics professor who watched the videos to which the Parties stipulated. Should he do so, the Defendants will address at the appropriate juncture why her opinion is both patently inadmissible and why, in any event, it presents no barrier to entering summary judgment for each of the Defendants.

standing his ground.  Although he claims that he never actually used the label "blocking," he acknowledges that at that point he felt that he was surrounded on all sides and that the crowd, including Phillips, was blocking him.  And his own therapist summarized Sandmann's recollection as "he was being blocked by the crowd" to reflect Sandmann's description that he felt "surrounded" and "stuck."  SF ¶ 50.

Yet unlike Phillips, Sandmann was largely surrounded by his friends and classmates, and he acknowledges they would likely have stepped aside for him.  So it was never physically impossible for Sandmann to leave.  *Id.*  The same common-sense gist of "blocking" applies no less to Phillips, and therefore to these Defendants.  Summary judgment is therefore warranted because the Blocking Statements are substantially true.

## CONCLUSION

For all the foregoing reasons, as well as the reasons set forth in the separate memorandum filed by each Defendant, each of the Defendants respectfully requests that this Court grant their motions for summary judgment and dismiss all claims against them.

Dated: December 20, 2021          Respectfully submitted,

Nathan Siegel (*pro hac vice*)
Meenakshi Krishnan (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1301 K St NW, Suite 500
Washington, DC 20005
Phone: (202) 973-4237
Fax: (202) 973-4437
nathansiegel@dwt.com
meenakshikrishnan@dwt.com

*/s/ Robert B. Craig*
Robert B. Craig (KBA 15590)
TAFT STETTINIUS & HOLLISTER LLP
50 East RiverCenter Blvd.

Suite 850
Covington, KY 41011-1683
Ph: (859) 547-4300
Fax: (513) 381-6613
craigr@taftlaw.com

*Counsel for Defendants ABC News, Inc., ABC News Interactive, Inc., and The Walt Disney Company*

*/s/ Darren W. Ford*
John C. Greiner (*pro hac vice*)
GRAYDON HEAD & RITCHEY LLP
312 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: (513) 629-2734
Fax: (513) 333-4316
jgreiner@graydon.law

J. Stephen Smith (KBA 86612)
Darren W. Ford (KBA 95373)
GRAYDON HEAD & RITCHEY LLP
2400 Chamber Center Drive
Suite 300
Ft. Mitchell, KY 41017
Phone: (859) 578-3070
Fax: (859) 578-3071
ssmith@graydon.com
dford@graydon.com

*Counsel for Defendant The New York Times Company d/b/a The New York Times*

*/s/ Jared A. Cox*
Jared A. Cox
DENTONS BINGHAM GREENEBAUM LLP
101 South Fifth Street, Suite 3500
Louisville, KY 40202
Phone: (502) 589-4200
Jared.cox@dentons.com

Jessica Laurin Meek (*pro hac vice*)
DENTONS BINGHAM GREENEBAUM LLP
10 West Market Street, Suite 2700
Indianapolis, IN 46204
Phone: (317) 635-8900

Jessica.meek@dentons.com

Natalie J. Spears *(pro hac vice)*
Gregory R. Naron *(pro hac vice)*
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
Phone: (312) 876-8000
Natalie.spears@dentons.com
Gregory.naron@dentons.com

*Counsel for Defendants CBS News Inc.,*
*ViacomCBS Inc., and CBS Interactive Inc.*

*/s/ Michael P. Abate*
Jon L. Fleischaker
Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD LLP
 710 W. Main St., 4th Floor
Louisville, KY 40202
(502) 540-8280
jfleischaker@kaplanjohnsonlaw.com
mabate@kaplanjohnsonlaw.com

Michael J. Grygiel (admitted *pro hac vice*)
Cyndy E. Neidl (admitted *pro hac vice*)
Kelly L. McNamee (*admitted pro hac vice*)
GREENBERG TRAURIG, LLP
54 State Street, 6th Floor
Albany, New York 12207
(518) 689-1400
grygielm@gtlaw.com
neidlc@gtlaw.com
mcnameek@gtlaw.com

*Counsel for Gannett Co., Inc. and Gannett Satellite*
*Information Network, LLC*

*/s/ Kevin T. Shook*
Kevin T. Shook *(pro hac vice)*
FROST BROWN TODD LLC
10 West Broad Street
Columbus, OH 43215
Phone: (614) 464-1211
Fax: (614) 464-1737

kshook@fbtlaw.com

Theresa A. Canaday
Samuel W. Wardle
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202
Phone: (502) 589-5400
Fax: (502) 587-1087
tcanaday@fbtlaw.com
swardle@fbtlaw.com

Michael E. Nitardy
FROST BROWN TODD LLC
7310 Turfway Road, Suite 210
Florence, KY 41042
Phone: (859) 817-5900
Fax: (859) 283-5902
mnitardy@fbtlaw.com

Ryan W. Goellner *(pro hac vice)*
FROST BROWN TODD LLC
301 East Fourth Street, Suite 3300
Cincinnati, OH 45202
Phone: (513) 651-6800
Fax: (513) 651-6981
rgoellner@fbtlaw.com

*Counsel for Defendants Rolling Stone, LLC and Penske Media Corporation*