UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

*Electronically Filed*

| | |
|---|---|
| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | : : : : : |
| Plaintiff, | : CASE NO. 2:20-cv-00027-WOB-CJS : : |
| v. | : **ORAL ARGUMENT REQUESTED** : |
| ROLLING STONE, LLC and PENSKE MEDIA CORPORATION, | : : : |
| Defendants. | : |

**SUPPLEMENTAL MEMORANDUM OF ROLLING STONE, LLC AND PENSKE MEDIA CORPORATION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

I.     INTRODUCTION ............................................................................................................. 1

II.    STATEMENT OF FACTS ................................................................................................ 4

III.   LAW AND ARGUMENT .................................................................................................. 6

        A.     The Blocking Statements are constitutionally protected opinion based upon the facts disclosed in the Rolling Stone Article and confirmed through discovery. .................................................................................. 6

        B.     The Blocking Statements are not defamatory when viewed in the context of the Rolling Stone Article and the undisputed evidence. ....................... 11

IV.   CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................... 7, 11

*Ball v. E.W. Scripps Co.*, 801 S.W.2d 684 (Ky. 1990) ................................................................. 12

*Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732 (Ky. Ct. App. 2004) ............................ 7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 11

*Clark v. Viacom Int'l, Inc.*, 617 F. App'x 495 (6th Cir. 2015) ...................................................... 6

*Cromity v. Meiners*, 494 S.W.3d 499 (Ky. Ct. App. 2015) ........................................................ 7, 10

*Dermody v. Presbyterian Church U.S.A.*, 530 S.W.3d 467 (Ky. Ct. App. 2017) .......................... 11

*Lassiter v. Lassiter*, 456 F.Supp.2d 876 (E.D. Ky. 2006) ............................................................ 11

*Loftus v. Nazari*, 21 F.Supp.3d 849 (E.D. Ky. 2014) ................................................................... 10

*McCafferty v. Newsweek Media Group, Ltd.*, 955 F.3d 352 (3d Cir. 2020) ................................. 15

*McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882 (Ky. 1981) ........................ 12

*Roche v. Home Depot U.S.A.*, 197 F. App'x 395 (6th Cir. 2006) .................................................. 12

*Sandmann v. WP Co. LLC*, 401 F. Supp. 3d 781 (E.D. Ky. 2019) ............................................. 2, 8

*Squitieri v. Piedmont Airlines, Inc.*, No. 3:17CV441, 2018 WL 934829 (W.D.N.C. Feb. 16, 2018) ................................................................................................................ 15

*Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781 (Ky. 2004) .................................................... 12

*Sweeney & Co. v. Brown*, 60 S.W.2d 381 (Ky. 1933) .................................................................. 12

*Yancey v. Hamilton*, 786 S.W.2d 854 (Ky. 1989) ..................................................................... 7, 10

I.   **INTRODUCTION**

This Memorandum supplements the Joint Memorandum in Support of Summary Judgment ("Jt. Memo") filed concurrently in this and related cases[1] and raises two additional arguments supporting dismissal of the claims against Defendants Rolling Stone, LLC and Penske Media Corporation (collectively, "Rolling Stone"). Based upon the undisputed facts from discovery and the specific context of the January 22, 2019 article published by Rolling Stone (the "Rolling Stone Article"),[2] the Plaintiff's claims should be dismissed because they are based on speech that is constitutionally protected opinion and not defamatory as a matter of law.

Plaintiff Nicholas Sandmann ("Sandmann") claims the Rolling Stone Article defamed him when it republished the following quote by Nathan Phillips:

> 'It was getting ugly,' . . . 'I was thinking: "I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial." I started going that way, and that guy in the hat stood in my way, and we were at an impasse. He just blocked my way and wouldn't allow me to retreat.'

(the "Blocking Statements"). The Rolling Stone Article came four days after a video depicting Phillips and Sandmann in a standoff went viral and launched widespread criticism of Sandmann, which later tempered when additional videos emerged. The Rolling Stone Article was *not* about the viral video, but about President Trump's support for Sandmann, the diverging public statements made by Sandmann and Phillips, and the media walking back its original coverage of the standoff after the emergence of new video.

---

[1]   Rolling Stone incorporates the Jt. Memo by reference here, and capitalized terms used here have the same meaning as in the Jt. Memo. The related cases are: *Sandmann v. N.Y. Times Co.*, No. 20-23-WOB-CJS (E.D. Ky.); *Sandmann v. CBS News, Inc., et al.*, No. 20-24-WOB-CJS (E.D. Ky.); *Sandmann v. ABC News, Inc., et al.*, No. 20-25-WOB-CJS (E.D. Ky.); and *Sandmann v. Gannett Co. Inc., et al.*, No. 20-26-WOB-CJS (E.D. Ky.)

[2]   The sole basis of Sandmann's claim against Rolling Stone is a single article about his encounter with Phillips published on Rolling Stone's website, www.RollingStone.com, on January 22, 2019. (Doc. 1 at ¶¶ 192-209; *see also* Declaration of Ryan Bort ("Bort Decl."), attached hereto as **Exhibit A**, at ¶ 4 and **Exhibit A-1** thereto.)

1

Sandmann claims that Rolling Stone failed to conduct "due diligence regarding the veracity of the viral video" and promoted a "false narrative that [Sandmann] had instigated a racist confrontation with Phillips by blocking his retreat. . . ." (Doc. 1, Complaint, ¶¶ 18, 24.) But the only mention of the viral video in the Rolling Stone Article was to discredit it.

This Court originally dismissed Sandmann's claims against the Washington Post based upon the same Blocking Statements, finding them to be non-actionable opinion. *Sandmann v. WP Co. LLC*, 401 F. Supp. 3d 781, 792-93 (E.D. Ky. 2019) ("*Washington Post*"). The Court further found the Blocking Statements to be non-actionable opinion because [t]here were no undisclosed facts, and the reader was in as good a position as Phillips to judge whether the conclusion he reached—that he was "blocked"—was correct." *Id.* However, the Court later granted reconsideration after Sandmann amended his Complaint to make "specific allegations concerning the state of mind of Phillips," including allegations that he "deliberately lied." *Washington Post*, Doc. 64 at 2. Based upon these amended allegations, the Court concluded: "'justice requires' discovery be had regarding these statements and their context." *Id.*

Rolling Stone filed its own Motion to Dismiss in this case on April 27, 2020. (Doc. 24.) This Court denied Rolling Stone's motion to dismiss, finding that "the Complaint states a claim for relief" because "Sandmann *alleges* that defendants published a factual, defamatory statement, period." (Doc. 35 at 4 (emphasis added).) In its Opinion and Order, the Court found that Sandmann stated a claim for relief assuming—as it had to—that Sandmann's allegations were true. But the Court is no longer bound by that assumption. At this stage, the Court must evaluate the Blocking Statements based upon the undisputed evidence established through discovery.

2

And discovery has now confirmed this case should be dismissed. Among other things, Sandmann admits that he intentionally planted his feet in front of Phillips to show him that his school would not be intimidated:

> I figured was it time for someone to plant their foot and stand there where I had been and just face up. And to me, that was standing up for the school, because I wasn't going to move. . . . I just felt like enough is enough, we don't need to respond to them anymore with chants: Someone's just got to stand here, be still and put their foot down.

(Nicholas Sandmann Deposition Transcript ("S.D.") at 174:25-175:21.)[3] Sandmann also admits Phillips could have perceived that Sandmann intended to stop Phillips' path forward. (S.D. 199:3-9 ("[H]e could have perceived that it was your intention to stop his path forward? A. Right.").)

And while Sandmann's Complaint alleges the Blocking Statements were defamatory, his testimony made clear that he is proud he stood his ground and "faced up" to Phillips. When asked why he did not step aside like his classmates, Sandmann explained: "[I]t's not how I was raised." (S.D. 193:25-195:2) In fact, Sandmann testified he "became kind of this poster for not being intimidated"—with his image emblazoned on "Stand Your Ground" t-shirts, Internet posts featuring Sandmann with the song "I Won't Back Down," and even a speech at the Republican National Convention. (S.D. 195:12-198:13; 288:1-289:3; 290:12-294:5; 359:21-364:11.)

The Joint Memorandum establishes the Blocking Statements, in and of themselves, are either nonactionable opinion or not materially false. This memorandum sets forth two additional reasons for dismissal: (1) the Blocking Statements are nonactionable opinion because the Rolling Stone Article fully disclosed the facts upon which the Blocking Statements were based and those facts were confirmed in discovery; and (2) the undisputed evidence establishes that the Blocking Statements within the context of the Rolling Stone Article are not defamatory as a matter of law.

---

[3] Excerpts of the Sandmann Deposition cited in the Jt. Memo are attached thereto as Exhibit B. Additional deposition excerpts not cited there, but cited in this supplemental memorandum, are attached hereto as **Exhibit B**.

3

## II.   STATEMENT OF FACTS

The material facts of this case are detailed in the Joint Memorandum. But a few additional specifics about the Rolling Stone Article are relevant here. The Rolling Stone Article's title is "Trump Comes to the Rescue of the MAGA Teens," and led with a photograph of President Trump. (Ex. A-1 at p. 1.) The opening paragraph of the Rolling Stone Article indicated it was covering the "confrontation" between "a rowdy group of students" and "a Native-American protester named Nathan Phillips" that had been recorded during the previous weekend. (*Id.*) The article also noted at least two sides to the incident: that Phillips was shown being "taunted by the teens" in one video clip of the January 18 incident, but that—before the Rolling Stone Article—"Sandmann released a statement alleging otherwise while directing people to other clips of the incident." (*Id.*)

The article went on to explain that "[d]ebate around the confrontation raged throughout the weekend" (after January 18 and before the Rolling Stone Article was published) and that, soon after, "President Trump came to the defense of the teens." (Ex. A-1 at p. 1.) The prominent feature of the first one-third of the Rolling Stone Article is former President Trump's view of the situation, as expressed in several of his tweets embedded in the article. (*Id.* at pp. 1-2.) In the tweets, among other things, the former President stated that Sandmann had been "treated unfairly with early judgements proving out to be false," and quoted Tucker Carlson for the assertion that "'[n]ew footage shows that media was wrong about teen's encounter with Native American.'" (*Id.* at p. 2.)

The article then covered Sandmann's publicly released statement on the controversy, including clickable text with a hyperlink to the full statement.[4] (*See* S.D. Ex. 20, Jt. Memo Ex. M.) In the statement, Sandmann indicated he was providing a "factual account of what happened on

---

4   Sandmann's assertion in his Complaint that after "the January 18 Incident and prior to Rolling Stone's January 22 Article, Nicholas had issued no public statements" (doc. 1, ¶ 216) is belied by his own pleading: "On the afternoon of January 20, 2019, . . . Nicholas made public a statement in which he provided a detailed and accurate factual description of the January 18 Incident." (*Id.* at ¶ 89; *see also* doc. 1-3.)

4

Friday afternoon at the Lincoln Memorial to correct misinformation" being disseminated about him. (*Id.* at p. 1.) The Rolling Stone Article also quoted various portions of Sandmann's public statement and his view of the events in question:

> Sandmann claims the students responded with 'school spirit chants,' after which Phillips and other Native-American protesters approached the group, with Phillips 'wading' into the crowd with his drum. Sandmann writes that Phillips locked eyes with him, approached him and began playing his drum 'within inches of my face.' Sandmann says that he was 'startled and confused' and only attempting to 'diffuse the situation' by standing his ground and smiling at Phillips. He continued to detail a belief that he and his classmates were victims.

(Ex. A-1 at p. 2; *see also* S.D. Ex. 20.) The Rolling Stone Article also noted that "[a]dditional videos confirm Sandmann's claim that African-American protesters yelled a series of vile invectives at the students. . . ." (Ex. A-1 at p. 2.)

In his statement, Sandmann also wrote that he "never felt like [he] was blocking the Native American protestor" and that he respected Phillips' "right to protest and engage in free speech activities." (S.D. Ex. 20.) Sandmann further acknowledged: "I can only speak for myself and what I observed and felt at the time," and urged readers to "watch the longer video clips that are on the internet as they show a much different story." (*Id.*)

The Rolling Stone Article then presented Phillips' account of the January 18 incident, noting that "Phillips has admitted that he attempted to intervene between the students and the African-American protesters, but has disputed Sandmann's account, as have other videos of the incident showing Covington students circled around Phillips, who said he felt threatened." (Ex. A-1 at p. 2.) The Rolling Stone Article then republished Phillips' "Blocking Statements," which he originally made to the *Washington Post*. (*Id.* at p. 2.) The article closed by observing the "confusion around what exactly happened," stating "Sandmann will continue to tell his side of the story when he sits down with Savannah Guthrie of the Today show Wednesday morning." (Ex. A-1 at p. 3.)

5

Sandmann alleges the Blocking Statements convey "a defamatory meaning because it imputes to [Sandmann] racist conduct," namely (1) "aggression constituting an intent-to-intimidate assault," (2) "menacing racial intimidation," and (3) "a hate crime for interfering with a Native American prayer and song ceremony." (Doc. 1 at ¶ 204.) Other than the Blocking Statements, Sandmann does not allege that any other content in the Rolling Stone Article was defamatory. And while Sandmann generally refers to other articles allegedly published by Rolling Stone (*see, e.g.*, doc. 1 at ¶ 205), he does not allege those articles were defamatory. (*see, e.g.*, *id.* at ¶¶ 219, 249, 255). The sole basis of Sandmann's claim against Rolling Stone is the republication of Phillips' Blocking Statements within the Rolling Stone Article. (*Id.* at ¶¶ 198, 202-204.)

### III.  LAW AND ARGUMENT

The Joint Memorandum established Phillips' statements, in and of themselves, are nonactionable opinion and are not materially false. In addition, Sandmann's defamation claim against Rolling Stone fails because: (1) the Blocking Statements are constitutionally protected opinion based upon the facts disclosed in the Rolling Stone Article and confirmed through discovery; and (2) the Blocking Statements are not defamatory when viewed in the context of the Rolling Stone Article together with the undisputed evidence.

### A.  **The Blocking Statements are constitutionally protected opinion based upon the facts disclosed in the Rolling Stone Article and confirmed through discovery.**

Statements are actionable only if they "make[] an assertion of fact—that is, an assertion that is capable of being proved objectively incorrect," *Clark v. Viacom Int'l, Inc.*, 617 F. App'x 495, 508 (6th Cir. 2015) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)). An opinion, on the other hand, is absolutely privileged as a matter of law and "occurs where the commenter states the facts on which the opinion is based, or where both parties to the communication know or assume the exclusive facts on which the comment is clearly based."

6

*Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989). A statement in the form of an opinion can be defamatory, but it "'is actionable only if it implies the allegation of an undisclosed defamatory fact'" as its basis. *Id.* (quoting Restatement (Second) of Torts § 566 (1977)). Kentucky state law is consistent with federal law on this point: an opinion based on disclosed facts can create liability only "if the disclosed facts are incomplete, incorrect, or if [the] assessment . . . is erroneous." *Cromity v. Meiners*, 494 S.W.3d 499, 503 (Ky. Ct. App. 2015) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990)). In determining whether a statement is a protected opinion, it "must be construed in the context of the entire communication." *Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 738 (Ky. Ct. App. 2004) (citing *Yancey*, 786 S.W.2d at 857).

Defendants' Joint Memorandum establishes the Blocking Statements were opinion, based on Phillips' subjective perceptions at the time as supported by disclosed facts. (Jt. Memo at pp. 32-33.) Sandmann, Phillips, and various bystanders to the incident have different interpretations as to what happened in the undisputed videos—but that is the very definition of a constitutionally protected opinion. (*Id.* at n. 9, and p. 39 at n. 13.) In addition, the context of the Rolling Stone Article further renders the Blocking Statements nonactionable opinion because the article disclosed all facts upon which the Blocking Statements were based; those facts have now been confirmed through discovery; and the Rolling Stone Article clearly presents the Blocking Statements as Phillips' opinion that Sandmann and others dispute. *Yancey*, 786 S.W.2d 854.

As a preliminary matter, Sandmann's bald assertion that "Rolling Stone inexcusably relied on a false, incomplete and out-of-context viral video," (doc. 1, ¶ 14), is dispelled by even by a cursory read of the Rolling Stone Article. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (plaintiff cannot rest on unsupported allegations of pleading to survive summary judgment). To the contrary: the article merely noted the existence of a "widely circulated clip," but nowhere

7

embedded or showed that video. The article's lead point was that *additional* video told a *more complete* story, which was causing the media to "walk[] back previous headlines in deference to the narrative put forth by Sandmann." (Ex. A-1 at p. 1.)

After noting the emergence of additional video and President Trump's tweets supporting Sandmann and his classmates, the Rolling Stone Article turned immediately to Sandmann's public statement on the issue, which stated that he was merely "attempting to 'diffuse the situation,'" that "he and his classmates were victims," and that additional video showed "Phillips 'wading' into the crowd," "lock[ing] eyes with him [Sandmann]," and "playing his drum 'within inches of my face.'" (Ex. A-1 at p. 4.) The article provided a direct link to Sandmann's statement so that readers could weigh it for themselves and thus gave all necessary context for a reader to evaluate the validity of each view provided in the article. (*Id.*)

The Rolling Stone Article only introduced Phillips' Blocking Statements after reporting on Sandmann's public statement and opinions regarding what transpired. This Court previously provided a list of disclosed facts that it believed formed the basis for Phillips' Blocking Statements: "the size of the crowd, the tense atmosphere, taunts directed at his group, and his memories of past discrimination." *Washington Post*, 401 F. Supp. 3d at 793. Though the Court later granted reconsideration to allow for discovery on the context of the Blocking Statements, the facts that the Court found to have formed the bases for Phillips' opinion can all be discerned from the Rolling Stone Article. For example, the Rolling Stone Article noted the crowds of different "protesters" at the Memorial, including the "small group of Black Israelite protestors yelling obscenities at the students" and a "rowdy group of students" from Covington Catholic. (Ex. A-1 at p. 1.) The article also described the strained atmosphere: the students had been "accosted by a group of black supremacist protesters" who yelled "vile invectives at the students" and "had also been harassing

8

the Native-American protesters." (*Id.* at p. 1, 4.). And the article noted that the "Covington students circled around Phillips, who said he felt threatened." (*Id.* at 4).

The fully disclosed facts identified by the Court and set forth in the Rolling Stone Article were all confirmed during discovery. Specifically:

(1) the crowd was sizable (*see* doc. 57, Video 10 at 00:00-00:10 (showing crowd); S.D. 260:11-22 (estimating figuratively that students numbered "250-ish"));

(2) the atmosphere was tense and included taunts (Jt. Memo, SF ¶¶ 17, 20 (third-party perceptions of "two really divided groups"), 32, 51 (perceived "taunts" included tomahawk chop and statement "grab his dick and twist it")); and

(3) Phillips' memories of discrimination were real and relived (Phillips Decl. at ¶¶ 9-10, 12 (Phillips believed the crowd evinced a "mob mentality" and evoked images of historical discrimination), 21 (Phillips was "scared" for those with him)).

Discovery has further established that as Phillips moved forward in the crowd of students, many moved but Sandmann did not; he intentionally stood in Phillips' way. (Jt. Memo, SF ¶¶ 37-41.) To Phillips, Sandmann "appeared to . . . position himself directly in front of me and to then stand there in my way." (Phillips Decl. ¶ 23.) Sandmann admits he consciously decided to "plant [his] foot and stand there where I had been" and that he "wasn't going to move" because "[s]omeone's just got to stand here, be still and put their foot down." (S.D. 174:25-175:21; 176:7-20.) The Rolling Stone Article disclosed this information, too, noting that Sandmann had been "standing his ground and smiling at Phillips." (Ex. A-1 at p. 2.)

While the basic facts of what happened are not in dispute, Sandmann and Phillips clearly viewed these events through their own cultural lenses. And to be clear, the overarching theme of the Rolling Stone Article was precisely that—there were "disputed" perceptions of what happened. (Ex. A-1 at p. 2.) For example, the article explained that Sandmann had a different view from Phillips and quoted extensively from Sandmann's public statement. (Ex. A-1 at p. 2.) Even Sandmann has acknowledged the incident is a matter of perception. (S.D. 175:22-176:6; 198:24-

9

199:16; 263:7-10.) The article also extensively addressed former President Trump's opinions about the events and the factual predicate for them, including that "early judgments [were] proving out to be false" and that "'[n]ew footage show[ed] that media was wrong.'" (Ex. A-1 at p. 2.) Further, the article observed that the media was "walking back" their initial reporting on the incident based upon the emergence of additional videos. (Ex. A-1 at p. 1.) The Rolling Stone Article referred readers to additional videos they could watch and a link to Sandmann's full public statement they could review to determine for themselves whose opinion of the events they agreed with. (*See generally* Ex. A-1.) The article therefore identified the facts on which all opinions in it—including Phillips'—were based, and implied no incomplete, erroneous, or undisclosed defamatory facts. *Yancey*, 786 S.W.2d at 857; *Cromity*, 494 S.W.3d at 503.

The Rolling Stone Article also contains all the badges of a quintessential opinion piece. The "category" tab in the upper-left corner of the article is "politics news," an inherently opinionated subject. (Ex. A-1 at p. 1.) The headline—"Trump Comes to the Rescue of the MAGA Teens"—demonstrates an opinionated focus on the President of the United States and the subtitle reinforces that. (*Id.* ("Right-wing media is using confusion over what exactly happened" to advance an alleged agenda).) Within this context, any reasonable reader would naturally conclude the article was composed of constitutionally protected opinions. *See Loftus v. Nazari*, 21 F.Supp.3d 849, 854 (E.D. Ky. 2014) (holding that "the natural tendency" is to infer material "posted on opinion websites" is opinion).

Given the context of the Rolling Stone Article, the video evidence it identified, and the information obtained in discovery, there were no undisclosed facts in the Rolling Stone Article and a reader of the article was "in as good a position as" Phillips to judge whether the conclusions he reached when he made the Blocking Statements were correct. *See Lassiter v. Lassiter*, 456

10

F.Supp.2d 876, 882 (E.D. Ky. 2006), *aff'd*, 280 F. App'x. 503 (6th Cir. 2008). For these reasons, the Blocking Statements are nonactionable opinion and Sandmann's claim should be dismissed.

> **B.  The Blocking Statements are not defamatory when viewed in the context of the Rolling Stone Article and the undisputed evidence.**

The Blocking Statements in the context of the Rolling Stone Article are also not defamatory as a matter of law. Sandmann claims Rolling Stone's republication of the Blocking Statements imputes to Sandmann "racist misconduct." (Doc. 1 at ¶ 196.) But after months of discovery, Sandmann has no evidence to support this allegation. First, Sandmann's own description of the standoff carries no more defamatory meaning than Phillips' Blocking Statements. Second, the Rolling Stone Article was published four days after the events and expressly discredited the viral video that led others to draw incomplete conclusions. Third, the Rolling Stone Article says nothing about racist misconduct. For these additional reasons, Sandmann's claims against Rolling Stone should be dismissed.

In its ruling on Rolling Stone's motion to dismiss (doc. 24), the Court accepted as true—as was required at that stage—Sandmann's allegation that "defendants published a factual, defamatory statement by Phillips." (Doc. 35 at p. 4.) However, the summary judgment standard is more exacting, and now that contention is not simply accepted. Sandmann may no longer "rest on his allegations" in his pleading, *Anderson*, 477 U.S. at 249, but must "produce "'specific facts' showing that there is a 'genuine issue' for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Sandmann has no evidence that would support a finding that the Blocking Statements carried a defamatory meaning.

And it is Sandmann's burden to establish the Rolling Stone Article conveys the claimed defamatory meaning. *Dermody v. Presbyterian Church U.S.A.*, 530 S.W.3d 467, 472-73 (Ky. Ct. App. 2017). Language is "defamatory" if it "'tends so to harm the reputation of another as to

11

lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Ball v. E.W. Scripps Co.*, 801 S.W.2d 684, 688 (Ky. 1990) (quoting Restatement (Second) of Torts § 559 (1977)). Written words are defamatory per se if they "tend to injure one in his reputation or to expose him to public hatred, contempt, scorn, obloquy, or shame." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 795 (Ky. 2004), *overruled on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014).

To determine whether "a publication is libelous per se, it must be stripped of all innuendo, colloquium, and explanatory circumstances, and, when so construed, it must be defamatory on its face, within the four corners thereof." *Sweeney & Co. v. Brown*, 60 S.W.2d 381, 384 (Ky. 1933); *see also Dermody*, 530 S.W.3d at 475 ("[I]nnuendo . . . cannot enlarge or add to the sense or effect of the words charged to be libelous.").

In all other cases, written statements are defamatory per quod and must be proven defamatory by extrinsic evidence, and require "special damages, *i.e.*, actual injury to reputation." *Stringer*, 151 S.W.3d at 795.

"It is an elementary principle of the law of libel that the defamatory matter complained of should be construed as a whole." *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 884 (Ky. 1981). In other words, a court must "analyze the article in its entirety and determine if its gist or sting is defamatory." *Id.* at 884. In doing so, words are always "given their ordinary, natural meaning as defined by the average lay person." *Roche v. Home Depot U.S.A.*, 197 F. App'x 395, 398 (6th Cir. 2006) (internal quotations and citation omitted).

Here, the gist or sting of the Blocking Statements is not defamatory, but quite consistent with Sandmann's own description of his standoff with Phillips. Not only does Sandmann admit that Phillips *could have* perceived Sandmann was blocking him (S.D. at 199:3-9), but Sandmann

12

concedes he intentionally planted his foot in front of Phillips to establish his school would not be intimidated: "I figured was it time for someone to plant their foot and stand there where I had been and just face up. . . . I just felt like enough is enough. . . . Someone's just got to stand here, be still and put their foot down." (S.D. 174:25-175:21.) The gist of Phillip's Blocking Statements is quite similar: ". . . . that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."

The evidence establishes that Sandmann takes pride in the fact that he did not step aside for Phillips: "It's not how I was raised." (S.D. 193:25-195:2.) According to Sandmann, "standing his ground" and "facing up" to Phillips was "very mature." (S.D. 189:1-2) And as a result, the public now perceives Sandmann as a "poster for not being intimidated"—with his image celebrated on "Stand Your Ground" t-shirts and featured in Internet posts with the song "I Won't Back Down." (S.D. 195:12-198:13; 288:1-289:3; 290:12-294:5). He even spoke on the "stand your ground" topic at the Republican National Convention. (S.D. 359:21-364:11). The veneration of Sandmann's own description of himself—standing his ground and facing up to Phillips to show he would not be intimidated—demonstrates that Phillips' corresponding description that he "blocked my way and wouldn't allow me to retreat" is not defamatory.

Sandmann's Complaint also alleges that "within hours after Rolling Stone published its false and defamatory January 22 Article, Nicholas became the subject of overwhelming public hatred, contempt, disgrace and scorn." (Doc. 1 at ¶ 163.) But according to Sandmann's testimony, the public scorn arising from the January 18 standoff came about immediately that evening when a video of the incident went viral (S.D. 393:3-8 ("[S]omewhere between 2 and 3 a.m., on the bus back, I got woken up and people found it trending on Twitter.")), not four days later on January 22 when Rolling Stone republished the Blocking Statements. Rolling Stone has no idea what

13

anonymous gadflies may have said about Sandmann on the internet, or if they assumed he was racist when they viewed the incomplete viral video that circulated cyberspace, but Rolling Stone's republication of the Blocking Statements four days did not convey such defamatory meaning.

Indeed, the crux of Sandmann's claim is that Rolling Stone's republication of the Blocking Statements somehow levels a charge of racial animus against him. (Doc. 1, ¶ 196, 204.) But Sandmann's alleged gist ought to have some relation to the actual publication. *See* Restatement (Second) of Torts § 563 (1977). It does not. The words "race," "assault," and "crime" appear nowhere in the Rolling Stone Article, nor do their derivatives or synonyms. Sandmann's gist is again based on perceptions or other publications by people not associated with Rolling Stone. It is simply not possible to draw the allegedly racial and defamatory meaning from the Blocking Statements in the Rolling Sone Article. Nothing about Phillips' assertion that "I started going that way, and that guy in the hat stood in my way, and we were at an impasse" inherently exposes Sandmann to "public hatred, contempt, scorn, obloquy, or shame." *Stringer*, 151 S.W.3d at 795. And the statement, "[h]e just blocked my way and wouldn't allow me to retreat," in the context of the whole of the Rolling Stone Article, does not carry a defamatory sting.

As explained above, the Rolling Stone Article provided a synopsis of several diverging views of the January 18 encounter, including those of the two major participants: Sandmann, with extensive quotations from and a link to his full public statement, and Phillips' statements to the *Washington Post*. Stripped of innuendo and external influence, the Rolling Stone Article noted Sandmann's belief that he had been "attempting to 'diffuse the situation.'" (Ex. A-1 at p. 2.) As to Phillips, the Rolling Stone Article stated that he "disputed Sandmann's account" and quoted his Blocking Statements. Given this context—Sandmann's account directly juxtaposed with (and

14

before) Phillips'—the Blocking Statements within the Rolling Stone Article are not capable of the *ex-post* defamatory meaning Sandmann attempts to impose on them.

The only possible sources of the racist defamatory meaning Sandmann attempts to impute to the Blocking Statements are per quod "explanatory circumstances" which Sandmann has imposed on the article after the fact and based on the general controversy surrounding the incident. Sandmann was (or is) convinced that "half the country hates" him. (S.D. 429:20.) He perceived individuals in the crowd were "crafting a story" to be taken to social media "before [he] even know[s] what's happening." (S.D. 316:21-318:16.) But Sandmann admits that he has no evidence to support that theory. (*Id.* at 317:21-318:16 ("Right. I don't – I have no idea. . . .")) And he has produced no basis for connecting any such critical inferences to the Rolling Stone Article.

Even if the Rolling Stone Article did somehow impute general racist misconduct to Sandmann (which it did not), "a simple accusation of racism is not enough to support a defamation claim. Rather, the accusation must imply more, by for instance suggesting that the accused has personally broken the law to act in a racist manner." *McCafferty v. Newsweek Media Group, Ltd.*, 955 F.3d 352, 358 (3d Cir. 2020); *see also Squitieri v. Piedmont Airlines, Inc.*, No. 3:17CV441, 2018 WL 934829, *4 (W.D.N.C. Feb. 16, 2018) (collecting cases and holding "accusations of bigotry or racism" are "nonactionable"). Such accusations are not present within the four corners of the Rolling Stone Article or in any way connected to the article or the Blocking Statements.

Sandmann's claim fails because the Rolling Stone Article is not defamatory on its face, and Sandmann has adduced no evidence showing that it could be construed as defamatory.

## IV. CONCLUSION

The statements at issue are constitutionally protected opinions and are not defamatory as a matter of law. For all these reasons, and those set forth in the Joint Memorandum in Support of Summary Judgment, the Court should enter summary judgment in Rolling Stone's favor.

15

Respectfully submitted,

/s/ *Kevin T. Shook*
Kevin T. Shook (*pro hac vice*)
FROST BROWN TODD LLC
10 West Broad Street
Columbus, OH 43215-3484
Phone: 614-464-1211
Fax: 614-464-1737
kshook@fbtlaw.com

Theresa A. Canaday (KBA# 88607)
Samuel W. Wardle (KBA# 97365)
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202-3363
Phone: 502-589-5400
Fax:  502-581-1087
tcanaday@fbtlaw.com
swardle@fbtlaw.com

Michael E. Nitardy (KBA# 91613)
FROST BROWN TODD LLC
7310 Turfway Road, Suite 210
Florence, KY  41042
Phone: 859-817-5900
Fax: 859-283-5902
mnitardy@fbtlaw.com

Ryan W. Goellner (*pro hac vice*)
FROST BROWN TODD LLC
301 East Fourth Street, Suite 3300
Cincinnati, OH  45202
Phone: 513-651-6800
Fax: 513-651-6981
rgoellner@fbtlaw.com

*Counsel for Defendants, Rolling Stone, LLC and Penske Media Corporation*

**CERTIFICATE OF SERVICE**

   I hereby certify that on December 20, 2021, I electronically filed the foregoing document with the clerk of the court by using the CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by e-mail or first-class mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

Todd V. McMurtry
Jeffrey A. Standen
J. Will Huber
HEMMER DEFRANK WESSELS PLLC
250 Grandview Drive, Suite 500
Fort Mitchell, Kentucky 41017
tmcmurtry@HemmerLaw.com
jstanden@HemmerLaw.com
whuber@HemmerLaw.com

              */s/ Kevin T. Shook*
              *Counsel for Defendants, Rolling Stone, LLC*
              *and Penske Media Corporation*

0144420.0730688   4885-4901-5301v9